# Alexander's Estate.

*Will—Probate—Issue devisavit vel non—Undue influence.*

In a will contest where the only question was undue influence, it appeared that the testator, who was ninety years old, but whose faculties were unimpaired, divided his estate equally between three sons and a daughter, charging against two of the sons who were the contestants, an indebtedness alleged by the contestants to be in great part due from one of them only. The third son who was a half-brother to the other children was in the habit of attending, under the testator's direction, to many of the testator's business affairs and had the custody of his books and papers other than the will. This son aided his father in stating an account against the contestants, and in the books the greater part of the debt was charged against one of the contestants only. A letter of the testator with which the third

son had nothing to do, indicated that testator entertained the idea that there were circumstances which made it proper to charge the debt against both of the contestants, and letters from the contestant not charged in the books, showed a recognition of the fact not only that the testator had entertained the idea of charging him in the will, but also that this idea was not irrational nor without some substantial basis. Testator's will was drawn by the testator's regular attorney, was executed before impartial witnesses in the absence of the third son, and remained in the possession of the attorney. *Held* that the evidence was insufficient to justify the granting of an issue to determine whether undue influence had been exercised upon the testator.

Where it is sought to set aside a will on the ground of mistake of a material fact by the testator, the test is not whether the fact was or might be established to the satisfaction of another person, but whether it was a clear mistake on the part of the testator which misled him, or was a conclusion of his own judgment though different from that which a court or jury might reach on the same information.

Argued Jan. 27, 1903. Appeal, No. 178, Jan. T., 1902, by Archibald A. Alexander, from decree of O. C. Phila. Co., Jan. T., 1896, No. 526, dismissing appeal from register of wills in estate of John Alexander, deceased. Before MITCHELL, DEAN, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Appeal from register of wills.

The facts appear by the adjudication of HANNA, P. J., which was in part as follows:

From the hundreds of pages of testimony, voluminous correspondence and numerous exhibits it is shown that testator as early as 1887 executed a last will and testament prepared by his professional adviser from instructions received from him. This was followed by another will executed in 1891, wherein he charged his two sons, contestants, with certain sums appearing in his ledger and identified by the pages thereof quoted in the will. No objection is made to its validity. Long prior to the date of this will testator entered into various business enterprises for the benefit of his sons, loaned and advanced them moneys, aided them in real estate investments and by loans and subscriptions to its capital stock, assisted them in the organization and establishment of a national bank at San Antonio, Texas, in which they were interested as stockholders and of which they became the president and cashier. At the request and solicitation of his sons, testator had numerous financial

transactions with the bank, consisting of loans and rediscount of notes discounted by the bank in the course of its business. For some years these financial transactions were profitable and satisfactory to the testator. But eventually he became exceedingly dissatisfied with the condition of affairs. The transactions with the bank caused him much solicitude and his account for loans and advances to his sons, particularly his eldest son, was so unsettled and unsecured as to render him anxious and persistent that the same should be closed and settled and the repayment of both the indebtedness of his sons and of the bank secured. The correspondence between testator and his sons in Texas was frequent and continuous in the year 1892. His constant requests for a settlement were met with as frequent promises. Visits were made to the father by the sons, and although settlement was always urged by him and as often acquiesced in by them, no promise was complied with, and no result approved by their father accomplished.

The dissatisfaction of testator increased, but his former urgent and almost pathetic requests became stern, parental demands. As he failed to procure from his sons a statement of their account and that of the bank with him he determined to prepare his own account from his books and the evidence of indebtedness in his possession. Testator was remarkably exact and methodical and his books with the entries all in his handwriting display his care, industry and accuracy to a wonderful degree. He made therein not only accounts with his children, but entries apparently of every investment and financial venture with which he had ever been connected or interested.

He accordingly requested his youngest son, who with his family and an older daughter of testator, composed the household, to prepare such an account. The account was accordingly carefully and laboriously prepared by testator's youngest son and with great minuteness included every item of charge testator claimed to be due him from his sons. This was in February, 1893, and resulted in a visit from testator's eldest son to his father.

The account which had been previously prepared was submitted to and carefully examined by him in connection with his youngest brother, and after many hours of scrutiny pronounced and marked by him correct so far as he was individually con-

cerned, with a single charge of interest excepted, and referring the items charged to his absent brother to him for approval.

But notwithstanding this the settlement which the testator so urgently required was again deferred; any payment of the indebtedness of his sons and of the bank remained unsecured.

The next fact appearing is that the testator consulted his counsel, who had prepared the will of 1891, and instructed him to prepare another will. Many of the provisions of the prior will were to be included therein. Testator's counsel, in pursuance of these instructions, accordingly prepared no less than three drafts, all of which were submitted to testator before the fourth or final draft met with his approval. And then the engrossed will was sent to testator by his counsel for execution. Testator carefully and minutely examined the will and was more critical and observant than his counsel: he discovered an error of the scrivener in a single word and declined to execute the will until it should be corrected. Those who attended as subscribing witnesses were consequently compelled to retire and the will was returned to counsel. Two days afterwards they again visited testator at his residence with the will corrected. A second time he carefully and leisurely examined the. paper. It then met with his satisfaction, and in his own handwriting completed the blank for the names of the executors, signed his name, and declared the paper to be his last will in the presence of the three attending disinterested subscribing witnesses. This was on March 15, 1893. Testator's request to his sons for a settlement with him continued, but without avail. In the summer of 1893 the Texas bank failed and was forced into liquidation. Testator believed himself to be a creditor of the bank to a very large amount and so declared himself in what is called a "proof of claim." But to his surprise the receiver of the bank declined to recognize his claim for the full amount upon the ground that the books of the bank showed many of the transactions claimed by testator to be between himself and the bank were in reality between himself and his son, the president of the bank. The "proof of claim" was again prepared, but, meeting with the same objection a third time, was corrected so that the testator's claim against the bank was reduced from over $17,000, as he alleged, to $8,000, upon which he received a dividend of fifty per cent. Testator, wearied with his vain

endeavors to obtain security for the payment of the indebtedness of his son and the importunities of both his sons to obtain further loans, finally placed all his books and papers, including the account prepared by his youngest son, in the care and custody of his counsel and employed him to effect the settlement he personally was unable to obtain.   The sons were represented by counsel, and after months of negotiation a supposed settlement was reached, but at the last moment repudiated.   At this very time, by reason of certain financial difficulties involving testator's eldest son, he was induced to save him from arrest to agree to advance about $5,000 additional in order to avert the danger.

But testator's youngest son prevented any further depletion of his father's estate, and by his personal effort and assumption of liability effected a compromise and final settlement with his brothers' threatening and dangerous creditor.   Still, testator was unsecured by his son for the payment of his indebtedness. And this led to the execution of the first codicil, dated June 27, 1894, fifteen months after the execution of the will.

This was also prepared by testator's counsel in pursuance of instructions received from him and executed in the presence of two of the subscribing witnesses to the will.

In this codicil testator recited that in the calculation of the sum of $115,100, which he referred to in his will and charged jointly against his two eldest sons, he omitted some amounts advanced by him prior to the date of his will, and accordingly directed they should be charged jointly with the sum of $121,800, with the same force and effect as if this amount had been written in the will.   He further directed that interest be charged on said sum from the date of the codicil at the rate of four per cent per annum : and in all other respects confirmed and republished the will.   And finally, on February 7, 1895, nearly eight months after the date of the first codicil and twenty days prior to his death, testator executed a second codicil, wherein he revoked a bequest in the third item of his will to his youngest son to be expended by him in furthering certain social and benevolent reforms.

Testator died February 27, 1895, at his residence in this city, having almost reached the age of ninety years.   Within one week after his death a caveat was filed with the register by one

of his sons against the admission to probate of any last will and testament. On March 21, 1895, the will and codicils were offered for probate. This resulted in a protracted contest and hearing before the register, continuing until July 29, 1895, when the caveat was overruled, petition for an issue dismissed and the will and codicil admitted to probate.

Letters testamentary were thereupon granted to the executors. If their controversy is righteous and quarrel with their half-brother just, the delay of the contestant is inexplicable and unexplained. They waited until the time allowed for an appeal under the act of March 15, 1832, was within one month of expiration, and not until June 29, 1898, two years and eleven months after the decree of the register, admitting the will and codicils to probate was an appeal taken.

In the meanwhile the executors entered upon the performance of their duties, filed on December 13, 1895, an inventory and appraisement, and subsequently their first account, which was audited and an adjudication thereon filed by the court to January term, 1896, unexcepted to and unappealed from. It is true the contestants' right of appeal is reserved to them by the act of assembly, but their further laches and delay until October 8, 1898, before the presentation of their petition for a citation, etc., is somewhat additionally persuasive of a lack of faith in the propriety and justice of the controversy so long allowed to slumber.

The present contest is most remarkable and unique. While it is alleged-in the petition originally filed that testator at the time of the execution of his will and codicils was not of sound disposing mind, memory or understanding or capable of making a valid will, and said writing was procured by the undue influence of his youngest son and prayed for issues to determine the testamentary capacity of testator and whether the will and codicils were procured to be executed by him by the undue influence of his youngest son, yet at the hearing before the court it was frankly admitted by counsel for the contestant that the testamentary capacity is conceded and no objection whatever made to the second codicil, executed February 7, 1895, as already stated, twenty days prior to the death of testator.

As also stated by counsel, it appears from the supplementary petition presented at the hearing the controversy is limited to

the questions whether a portion only of the fourth item of the will, the entire eighth or residuary clause of the will and the entire codicil of June 27, 1894, were procured to be inserted in the will and added thereto in the codicil by the undue influence of the youngest son of testator and half-brother to the contestants.

It was also conceded by counsel and could not otherwise be than admitted that testator possessed full power and authority in disposing of his estate to charge his sons with whatever amount he deemed proper by way of an advancement; in other words, convert debts into advancements. And it was also conceded to be the law, that the sons cannot be permitted to show that the amount so charged against them is incorrect in amount, or a mistaken calculation by testator.

So that it finally resulted in the inquiry whether through the malign and fraudulent influences exerted by the youngest son of testator over the mind of his father, the latter was induced to include in the fourth item of his will the portion embraced in the supplemental petition; and to execute the entire residuary clause wherein he not only bequeathed his residuary estate to his four children in equal shares and charged against the shares of his two oldest sons the sum of $115,100, but also in the first codicil with the increased amount of $121,800.

The contestants were the only witnesses examined in their behalf excepting the youngest son of testator, who was called by them as a witness under cross-examination and for many hours subjected to the most searching and rigorous examination. While on behalf of the executors and trustees, the proponents, was submitted the testimony of the counsel of testator, who had been for thirteen years his professional adviser, of a domestic servant in the employ of testator at the time of his death, of the youngest son of testator in his own behalf, and of the subscribing witnesses to the will and codicil.

Accordingly, confining the inquiry first to the will dated March 15, 1893, the material facts relative to its preparation have already been referred to. And it will suffice to say not a scintilla is shown that the youngest son was instrumental to its preparation or made any suggestion to his father relative to its provisions, other than he requested as a bequest some specific articles of furniture.

There is no evidence he requested his father to insert either the fourth item in his will, the residuary clause, nor the amount therein stated charged as an advancement to testator's sons, nor was he connected in the remotest degree with the preparation of either codicil.

And it has some significance that contestants are candid enough to admit the honesty and fair dealing of their half brother and concede he was not a conspirator with his father to defraud his brothers, nor a party to the execution of the second codicil revoking a bequest to him of $1,000 to be expended by him wholly in his discretion. The testimony further shows that the only connection he had with the ascertainment of the amount due testator from his two eldest sons is that at his father's request he laboriously prepared from his father's books and papers a statement of the account between him and his sons, and thus ascertained the sum total of their indebtedness. There is no evidence that testator's youngest son cajoled, instructed, demanded or solicited his father to insert any sum either in his will or codicil and influence him in any manner whatever to charge his two sons therewith. And the uncontradicted testimony of the testator's counsel, a gentleman of eminent ability and reputation, is that all his interviews respecting the execution of the will and codicil were with testator alone, that his son was never present, never gave him either instructions or suggestion, and the amount of the sons' indebtedness was communicated to him by his client, the testator.

Furthermore, the facts show the improbability, if not impossibility, that any one, much less either of his sons, was able to exercise any influence whatever upon the mind and intention of their father. He was a descendant of a sturdy, rugged and self-willed race. He was tenacious of what he deemed to be his right, determined and self-reliant. He was possessed of remarkable business ability, as shown by his books of account kept by himself and containing entries of his numerous financial transactions and investments made by him during a long series of years.

Testator lived to be almost ninety years old, was large of stature and vigorous in health until a few weeks prior to his death. He personally transacted his business affairs, aided to some extent by his youngest son, who resided with him. And

as illustrative of the mental and physical vigor of testator in the early winter of 1893, many months after the execution of his will, he journeyed to Pittsburg and there delivered an address entitled "History of the National Reform Movement," before the faculty and students of the Allegheny Theological Seminary, by whom it was afterwards printed for circulation.

Need it be said that a man possessing such mental characteristics and imperious force of will could not be easily influenced and induced to adopt a course other than he of his own volition had resolved upon and which he believed to be effective in accomplishing his clearly intended equitable distribution of his estate among his four children? In view of the admitted testamentary capacity of testator, which as defined by TRUNKEY, Justice, in Wilson v. Mitchell, 101 Pa. 495, "It is not so much what was the degree of memory possessed by the testator as this : Had he a disposing memory? Was he capable of recollecting the property he was about to bequeath; the manner of distributing it and the objects of his bounty? To sum up the whole in the most simple and intelligent form : Were his mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged at the time when he executed the will." Followed in the recent case of McGovran's Est., 185 Pa. 203, where the rule was applied by STEWART, P. J., and affirmed by the Supreme Court. It will require very strong and convincing evidence of undue influence to set aside the will of a testator prepared and executed under such circumstances and who is admittedly fully cognizant of the nature and character of his testamentary act.

And even although the will be executed with the knowledge and active assistance of a confidential friend and adviser, which relation to the testator it is contended was occupied by his youngest son, yet even there the burden of proof is upon the contestant to show undue influence as was held by this court in Estate of Mary Yorke, Deceased, affirmed by the Supreme Court in 185 Pa. 61.

And although it is said in Miller v. Miller, 187 Pa. 572, that it is not necessary that the confidential agent of the testator should have been his attorney "or that sustaining his filial relation he did not also hold an artificial one under the trust and confidence reposed in him by his father in business affairs,"

and from the facts in that case which was the trial of an issue d. v. n., it appeared the defense of the will rested on the theory, viz., "that the son was the trusted and confidential agent of his father," and for years had so faithfully performed his duty in that respect that it amply explained the favor shown towards him by his father, yet the will being so largely in his favor, the jury should have been instructed that a presumption of undue influence was raised and the burden was upon him to rebut this presumption. But that case is clearly to be distinguished from the present. As shown in the prior report in Miller's Estate, 179 Pa. 645, an appeal from the refusal of an issue, the testator not of extreme old age, was addicted to the inordinate use of intoxicating liquors, afflicted with locomotor ataxia and alleged to be of weakened intellect, the result of dissipation and disease. One of his sons lived in his father's house, " was his confident for years, his helper in his physical infirmity, his adviser in his business affairs," and the recipient by his father's will and codicils of three fourths of his large estate, besides being appointed one of the executors. Under the facts there proved it was clearly proper to award an issue to determine the question of undue influence and cast the onus of proof of its absence upon the son who claimed so large a share of the estate. And in reversing the court below and awarding the issue, DEAN, Justice, further said: " The condition of mind of a testator alleged to have been unduly influenced, although of testamenttary capacity, is important in determining whether the act was the result of the fraudulent arts practiced upon him." How different all the facts in the present case. The allegations of testamentary incapacity abandoned and request for an issue upon that question withdrawn, both as to will and codicil. The testator, although of such advanced age, clear and vigorous in intellect, of abstemious habits, and of good physical health until a few weeks prior to his death. During all this time transacted his own business, aided but occasionally by his youngest son, who resided with his father, keeping his own books and conducting a continuous and almost daily correspondence with his sons, located in Texas, relative to his financial business relation with them and the bank with which they were connected. There being no evidence that the youngest son of testator was instrumental in the procurement of the ex-

ecution of either will or codicil and claimed no virtue in himself, nor that the bequest of the equal share of the residue was any reward for his faithfulness to his father's interest nor compensation for past services, and although under all the circumstances, not bound to rebut any presumption arising from his residence with his father and his occasional services in the management of his affairs, yet in view of the aspersions cast upon his good name and reputation the youngest son of testator eagerly availed himself of every opportunity to rebut the slightest presumption of wrong and suspicion of unfair dealing towards his brothers. From his uncontradicted testimony it appeared that the account of their indebtedness was prepared by him at the request of his father. That he was not connected with the preparation of the will or codicil in the remotest degree and was not present at their examination by testator nor at their execution. In this he is fully corroborated by the counsel of the testator and the subscribing witnesses. The contestants failed to produce the slightest proof of any request or solicitation on the part of the youngest son of testator or that he exerted any influence whatever upon the mind or intention of his father in the preparation of either will or codicil. To sum up the whole matter, it is simply this, that testator concluded his two eldest sons had already been advanced individually or for their benefit a large proportion of his estate, and, in order to work out an equitable distribution of his property and protect the children not indebted to him, they should be charged jointly with the amount loaned and advanced to them, together with a debt of the Texas National Bank, of which they were the officers. He accordingly so directed, clearly and unmistakably, as he had the undisputed right so to do.

The auditing judge found that the appeal should be dismissed.

Exceptions to the adjudication were dismissed by the court in banc, in an opinion by PENROSE, J., largely quoted in the opinion of the Supreme Court.

*Error assigned* was the decree of the court.

*Joseph deF. Junkin* and *M. Hampton Todd,* for appellant.

*George Wharton Pepper* and *John G. Johnson* for the Fidelity

Trust Company and *Lucien H. Alexander* in propria persona, were not heard.

PER CURIAM, May 11, 1903:

That the making of the will was the testator's own act was convincingly shown by the preparatory drafts and consultations with his counsel. The directions were his own, and were clearly imparted by himself to counsel who embodied them in his will. The alleged undue influence therefore must have antedated the making of the will, and have been powerful enough to operate in the absence of the influencing party or parties. This is rendered highly improbable by the universal and undisputed testimony as to the strong and masterful personality of the testator, and the court have found that there is not a scintilla of evidence to sustain the allegation.

The only other point on which anything need be said is the testator's charge in the will and codicil of a large sum as an advancement against the contestant and another son. The learned counsel for the appellants are too well versed in the law to question the right of a father to dispose of his estate even as against his children in such manner as he chooses, but they rest their case on the ground that the provision as to said advancement was made under a mistake of fact, sufficiently material and sufficiently shown by the testator's assigned reasons, to require the setting aside of this part of his will. The crucial question however is not whether the alleged fact was or might be actually established to the satisfaction of another person or tribunal, but whether it was a clear mistake on the part of testator which misled him, or was a conclusion reached by his own judgment though different from that which the court or a jury might reach on the same information. If the latter it cannot be assailed however unreasonable it may seem. The testator was entitled to form his own judgment and to act upon it without regard to whether it agreed with that of others or not. The evidence shows that the direction as to the charge of the advancement against both his sons was the result of the testator's deliberate judgment and intention. On this point we adopt the language of the court below: "It is true that in his family book the debt which the will directs shall be charged jointly against two of his sons, is charged against one of them

only; but that he entertained the idea that there were circumstances which made it proper to charge it, ultimately, against both, is clearly indicated by his letter to them of December 30, 1892. The suggestion that this letter emanated from another son, the half-brother of the two thus jointly charged by the will, is absolutely without support by the evidence. It was copied, at the instance of the testator, by the sister of the older brothers, the copy being sent, and the original, in his handwriting, retained; while the letters of January 13 and January 18, 1893, from the son not charged in the book, expressing his willingness that 'anything that may be coming' to him may be 'pledged as security for any advance' to the other brother, 'in Arizona or Texas,' or for any of his personal or the bank's indebtedness, are a clear recognition of the fact not only that the idea was entertained, but that it was not irrational or without some substantial basis."

Decree affirmed at the costs of appellants.