# Schultz's Appeal.

1. A testator wishing to bequeath his estate to charitable uses was told that it would be invalid if he should die within a month, but that he might give it unconditionally to some person whom he could trust to carry out his wishes; Yeakle was named, and an absolute bequest was made to him. Testator died within the month and Yeakle being informed of his death and wishes, said he would carry them out. *Held*, that there was nothing in the circumstances to fasten a trust on Yeakle, and that the bequest was not within the words of the Act of April 26th 1855.

2. The charities would have had no claim, legal or equitable, to enforce payment by Yeakle, nor would he be guilty of fraud against them or the testator, if he should apply the bequest in any other way; his declaration of intention would not bind him.

[Schultz's Appeal.]

January 21st 1876. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, and WOODWARD, JJ.

Appeal from the Orphans' Court of *Montgomery county:* Of January Term 1876, No. 82. In the distribution of estate of Frederick Schultz, deceased.

The decedent died on the 13th of September 1872, having made his will, dated September 6th 1872. He appointed Jonathan Krause the executor.

A caveat was entered to the probate of the will, because it was procured by duress—undue influence and fraud—and for want of capacity in the testator. A feigned issue was framed, on the trial of which the will was established.

After directing the payment of his debts, &c., the only other provision was: " As touching all the rest, residue and remainder of my estate, real, personal and mixed, I give, devise and bequeath the same unto Reuben Yeakle, now of Cleveland, Ohio, and his heirs and assigns for ever."

The testator left no children or widow, but a large number of collateral heirs, being brothers and sisters, and descendants of brothers and sisters who had died.

On the 11th of August 1874, the executor settled an account of his administration, showing in his hands a balance of $10,043.57. Charles T. Miller, Esq., was appointed auditor to distribute the balance.

It appeared that the testator, residing in Montgomery county, being very sick, sent for a scrivener to draw his will. Upon the arrival of the scrivener, the testator told him he wished to give his estate to benevolent and charitable objects, which he specified. The scrivener informed him that if he did so the will would be void, should he die within thirty days; but upon his expressing much anxiety that his estate should be disposed of in the manner he had mentioned, the scrivener told him he could leave his property unconditionally to whom he pleased, and if such person would dispose of it as he wished, it might be done.

The question was whether, the bequest having been made within a calendar month of the testator's death, it was in contravention of the Act of April 26th 1855, sect. 11, Pamph. L. 332, 2 Br. Purd. 1477, pl. 22, prohibiting charitable bequests within a month of the testator's death.

On the hearing before the auditor, the next of kin, called Edward Schultz, a son of a deceased sister of testator, who testified:

" I was at Frederick Schultz's while they were getting ready to draw the will and when the will was drawn. When I came there Frederick Schultz told me to go for Squire Super; this was September 6th 1872. I went for Squire Super, and Squire returned with me to the house. When I got there Frederick's desire was that Squire should write his will. Squire asked Frederick how he

wanted his will written. Frederick said he wanted to leave one-fourth part of his estate to The American Tract Society, one-fourth part to Missionary Society of the Evangelical Association, one-fourth part to The Orphans' Institute of the Evangelical Association at Flat Rock, Ohio, and the other fourth part 'where it would do the most good.' Squire Super told him in case he should not live thirty days it would be all of no avail. He lay then sick and wished to have something done, and a proposal was made: it was said to him that he could dispose of his property to a particular person, unconditionally, and if that man would do it, then he could put it to these places where he wanted it; but that would be entirely at his option; he could do it or not. It was explained to Frederick; I explained to him; Squire Super explained it to him, and Dr. Schultz explained it to him I think. In the first place he could not understand it right; afterwards I think there was nothing about it he did not understand; and after he understood it he wished it to be made so; and the next was to find a man to whom it should be bequeathed. I proposed Reuben Yeakle, so far as I remember, as the man. Frederick then agreed to Reuben Yeakle. Reuben Yeakle was considered to be an honest man, and it was for this reason he was taken, and because he was acquainted with these societies mentioned."

In answer to the question, "Was the understanding of Frederick Schultz, when he gave these directions to Squire Super to write the will, that Reuben Yeakle was not to retain the money for himself, but would apply it as he, Frederick, desired it, to the religious societies named?" witness said, "The understanding was that if he would put it there he might, and if he did not want to he need not; that he could do with it as he pleased. * * * I said that through Yeakle, his desire could be carried out in the distribution of his property: to have his property divided as I have stated. I do not think if there had been no fear that Frederick would die inside of thirty days after signing his will that Reuben Yeakle would have been picked out as his legatee. * * * Frederick said in his well days how he wanted his property disposed of; and as I understand the law, it was only intended to apply to invalids, who were weak in understanding and overpersuaded. Frederick, before he was sick, had told me how he wanted his property disposed of, and it was the same as he told Squire Super on his death bed. The object was to carry out the wish of Frederick in that way. There was a chance to carry it out in that way if the legatee was willing. Reuben Yeakle was selected because it was thought he would agree to it. If it had been thought by Frederick Schultz that Reuben Yeakle would not carry out that wish, I guess he would not have been named as legatee. Soon after the will was written, within two months, I communicated it to Yeakle. I told

him how Frederick wanted this property disposed of and why he was named in the will.''

The witness further testified that, at the time, or after the will was written and before the testator died, nothing was said by him to witness, or by witness to him, about informing Yeakle as to what had been done in placing his name in the will and the purpose for which it was done; witness could not say positively whether he informed Yeakle of the bequest, or the reason of it, before the testator died; he thought Yeakle was not informed until after the testator's death.

Also, Philip Super, who testified: " I am a conveyancer. * * * I was called upon by Edward Schultz to go to the house of Frederick Schultz, to write Frederick Schultz's will. I went over with him to Frederick's house. Frederick Schultz, when I went to his house, was sick in bed. Edward Schultz and Jonas Schultz were there. I think the sister passed through the room once or twice while we were there. I went to the bed. Frederick I think extended his hand to me. I then mentioned I had come to write his will. He then said Edward could tell me what he wanted written. I replied, that would not do; it was his will I was to write and that I must have my directions from him. He then said he wished to give one-fourth to the Missionary Society. I don't know whether he said the Missionary Society of my church or whether he said of ' The Evangelical Association;' as I knew him to be a member of the latter association, I understood him to mean that association. That is a religious society. One-fourth to ' The Orphans' Home' of the same society. One-fourth to ' The American Tract Society.' That is also a religious society. The other fourth he wished the executor to appropriate to some good object. I told him that would not do, if he should die within thirty days from the time of making his will. I think Frederick asked why he could not do with his own what he pleased. I told him that he expected to die within thirty days and then the law would not permit such a bequest. I am sure Frederick asked this question while I was there. I told him he could leave it to any individual he pleased, but it must be unconditional. I then left the bed-side and left him and Edward Schultz talking together. I don't know how the name of Reuben Yeakle was introduced, but it was introduced. It was not introduced by me. It was introduced in a conversation between Frederick and Edward Schultz; heard the name mentioned. I then again commenced conversing with Frederick and explained to him why he could not do as he pleased, on account of the Act of Assembly prohibiting such gifts in case death took place within thirty days, and then remarked that if he chose to give this property to Reuben Yeakle without conditions, I supposed he had a right to do so. I had cautioned him before, he

could make no conditions in explanation.    He then said write it that way ; that was the answer." * * *

In answer to the question : "Was it not the object of Frederick Schultz and of yourself in making the bequest to Reuben Yeakle, to evade the Act of Assembly already referred to ?'' the witness said : " I cannot speak for Frederick Schultz's object.  I can speak my own object ; I was not acquainted at that time with Reuben Yeakle, but as his name was mentioned in the course of the conversation, I supposed he was a person in whom Frederick had confidence. And as Frederick had remarked to me, he wished his money placed where it would do the most good, I supposed Reuben Yeakle would make as good use of it as anybody else.  I knew Reuben Yeakle personally, but did not know his relation to the church. I supposed from the fact of Frederick naming him that he was a person who might use it for the purpose of those societies, or might not ; it was mere supposition ; there was nothing said." * * *

Also, Reuben Yeakle, who testified : " I live in Cleveland, Ohio. * * * I am bishop of the Evangelical Association.  The territory of the entire church, wherever it is, is in my jurisdiction.  I knew Frederick Schultz in his lifetime.  I understand he was a member of the church over which I preside as bishop.  I saw him at a camp-meeting I think in 1872, near Pennsburg, in Montgomery county, which was the last time I saw him previous to his death. I did not have any conversation with him then ; simply greetings as we met each other.  I did never converse with him as to the disposition he should make of his worldly affairs at his death.  He and I were not intimate friends ; we had a slight acquaintance from meeting each other only a few times.  I am somewhat related to him, which I cannot explain—a distant relationship.  I have seen him in my lifetime I may say three or four times.  I have lived in Cleveland, Ohio, fifteen years.  I was first apprised of Frederick Schultz's will pretty soon after his death ; can't say how many days or weeks.  I think Philip Super first wrote to me informing me of his death and about the will. * * * The substance of the letter was, that Mr. Schultz had made such a will as he did make.  I don't think he gave me the phraseology of the will, but informed me that he made me the legatee under the will.  I don't think he informed me of Frederick Schultz's wish as to the disposition I should make of it. * * * I got another letter soon afterwards from Edward Schultz. * * * That letter contained the same information as Super's.  I think it was more definite with regard to Schultz's wish.  As near as I remember, it was that Frederick Schultz desired to apply his estate to benevolent or rather religious purposes.  He mentioned the American Tract Society, the Missionary Society of the Evangelical Association, the Orphans' Institute of the Evangelical Association at Flat Rock, Ohio.  I think that is all that was specified.  He said this was

Frederick's wish as expressed to him some time before his death. I think I replied to that letter. I think I requested another letter from Edward Schultz. I think I got a reply to it. Edward Schultz wrote to me pretty soon after Frederick's decease and I think I replied promptly. The letter which I wrote to Edward contained allusions to the will of Frederick Schultz, as I had an interest in it after the information I had received. I could not tell definitely what I asked in that letter, but I wanted fuller explanations; that I remember. I received a reply to this letter. The second letter from Edward Schultz contained about the same matters as the first letter, excepting I think this was in addition that one-fourth of his estate should be paid to the American Tract Society, one-fouth to the Missionary Society of the Evangelical Association, one-fourth to the Orphans' Institution of the Evangelical Association of Flat Rock, Ohio; the other one-fourth was left undecided, but to be applied to religious purposes. I think I wrote a reply to this second letter of Edward Schultz's. * * * All the societies named excepting the American Tract Society belong to the religious organization of which I am bishop. These societies have their own organization, officers and board of managers. I have no special official connection with them only as they belong to the. church over which I, as bishop, have general supervision." * * *

In answer to the question : " If the will makes an absolute bequest of the property to you, what would you deem it your duty to do with the money if you received it under the statements made to you by Edward Schultz and others, of Frederick's intention ?" the witness said, " I would try to ascertain the precise wish of Frederick Schultz and apply it accordingly. I, as bishop, have no control over the church property. I, as bishop, have no control over the property of these associations which have been named. The title is in no respect in me of any of the property belonging to the societies. * * * I have not seen the will, but if it gives me the absolute right to the property, without condition, I should consider that I had the legal right to do with the property as I pleased. I .draw a distinction in this case between the legal and moral right ; but I would feel bound to ascertain what was Frederick Schultz's wish and act accordingly."

They then gave in evidence a letter from Yeakle to Edward Schultz, of which the following is an extract :—

" Cleveland, O., May 6th 1873.

Dear Bro. EDWARD SCHULTZ :

Yours of the 2d inst. was duly received. In reply, I would say that if F. Schultz's bequest ever gets into my hands, it will be applied as you informed me that Fred. wanted it applied. It will not go to my heirs (*in no case*) ; I have provided against that

30 P. F. SMITH—26

in my will. I think you did right in suggesting this thing to Fred., so as to get his estate for the work of God. But I don't understand the legal proceedings at Norristown. If the executor is authorized to execute the will so far as settling up the estate, why that is already a recognition of the will." * * *

The auditor, after recapitulating the evidence, reported : * * *
" It seems to me therefore conclusively established that the bequest to Reuben Yeakle was absolute, and that it was so intended by the testator, and that any future disposition of the property was left entirely at the discretion of the legatee. It is true that the testator hoped and believed the legatee would carry out his wishes, but he also knew that he could not compel him to do so by any binding trust and it was accordingly not attempted. * * *

" On the day the will was written and executed the testator expected to bequeath his property directly to these charities. He had never thought of Reuben Yeakle, who was then living in Cleveland, Ohio, where he has been living the past fifteen years. He did not even know Yeakle intimately, having only met him casually three or four times in his life. He had never spoken with Yeakle on the subject of making his will. In fact the idea of bequeathing the property to any one, other than these charitable associations, never occurred to the testator until Super at the time of writing the will, suggested the propriety of its being done. Yeakle could therefore have had no agency in procuring the making of the will, nor could he have had any knowledge of its existence or of its contents until the fact was communicated to him as above stated after the death of the testator."

The auditor, after referring to very many English authorities which he elaborately discussed, stated the following conclusions:—

" 1. That mere parol declarations by the testator as to his wishes concerning the disposition of his property, whether made cotemporaneously with the execution of the will or at another time, in the absence of fraud, cannot be admitted in evidence, under the Statute of Wills, so as to affect the written will.

" 2. That the testator himself cannot create a valid parol trust in opposition to the terms of his written will, but whenever the testator is induced by the devisee, either by promises or otherwise, to *omit* from his will a devise which he would have made, had such inducement not been held out to him, there *equity*, and not the testator, raises a trust and converts the devisee into a trustee for the purpose of compelling him to carry out the intentions of the testator, and thus preventing him from perpetrating a fraud by appropriating the property to his own use.

" 3. That equity never raises such a trust except in cases where the devisee in some way, by words or silence, encourages or induces the testator to devise the property to him.

" 4. Where the devisee induces the testator to devise the property to him upon the secret understanding that he will appropriate it to a charity, there the court of equity holds the devisee to be a trustee for the charity, and if the testator dies within the time limited by the Statute of Mortmain, the trust for the charity is avoided by that statute. To hold this secret trust for a charity to be valid would be a fraud upon the statute.

" 5. Equity raises a trust for the purpose of preventing a fraud upon the statute, precisely upon the same conditions as a trust is raised to prevent a fraud upon an individual." * * *

" There could, therefore, in the case under consideration, have been no fraud upon the statute, unless the gift to Yeakle was upon a secret trust for charitable purposes, and there could have been no secret trust for charitable purposes such as a court of equity would recognise and enforce, unless Yeakle had some agency, active or passive, in procuring the bequest. The facts as already found show that Yeakle had no such agency; the bequest to him was therefore not in fraud of the statute and accordingly, not void.

" But the heirs of Frederick Schultz contend, that Edward Schultz, having assumed to promise the testator that Yeakle could be trusted to carry out his wishes and with this view the bequest having been made to Yeakle, and Yeakle having after the death of the testator accepted the bequest and promised to carry out the wishes of the testator, he must now be regarded as a trustee and the bequest to him be considered void as in fraud of the statute. Edward Schultz was not the agent of Reuben Yeakle; whatever suggestions he made to the testator were unknown to and unauthorized by Yeakle. Edward Schultz was only the friend and relative of the testator, and assisted him in disposing of his property, so that he might have a chance of gratifying his wishes in giving his property for charitable purposes. Edward Schultz and the testator were both perfectly aware that the property could not be bequeathed by the will in trust for a charity, and they also well knew that if it was to be given to any one it must be given to him absolutely unfettered by any trust or condition, and that if the legatee should afterwards appropriate it to charitable purposes it would be only by his own voluntary act; and that the legatee could not be compelled to do so by any legal or equitable power of the court. With this knowledge the testator made the bequest and it does not matter who suggested the name of Yeakle; the bequest was made to him by the testator with a perfect knowledge that Yeakle could, if he saw fit, appropriate the property to his own use, but with the hope that he would use it for charitable purposes. * * *

" I am constrained to decide that the bequest to the residuary legatee is valid."

[Schultz's Appeal.]

The auditor therefore awarded the fund to Reuben Yeakle.

The next of kin of the testator filed exceptions to the report.

The court, Ross, P. J., overruled the exceptions, confirmed the report and decreed distribution, as reported by the auditor.

George Schultz and others, the next of kin of Frederick Schultz, appealed to the Supreme Court and assigned the decree of the court for error.

*C. Hunsicker* and *G. R. Fox*, for appellants.—The effect of this transaction as designed by the parties would be a fraud on the Act of 1855; the law will reach all such devises: Muckleston *v.* Brown, 6 Vesey 52; Hoge *v.* Hoge, 1 Watts 163. Parol evidence is admissible to prove that an instrument absolute on its face was a trust, &c.: Chalfant *v.* Williams, 11 Casey 212; Christ *v.* Diffenbach, 1 S. & R. 464; Hurst *v.* Kirkbride, cited in Wallace *v.* Baker, 1 Binn. 616; Oliver *v.* Oliver, 4 Rawle 141; Miller *v.* Henderson, 10 S. & R. 290; Rearich *v.* Swinehart, 1 Jones 238; Slaymaker *v.* St. John, 5 Watts 27. In Hoge *v.* Hoge, *supra*, this rule was applied to a will. A devise on a secret trust for a charity is an evasion of Statutes of Mortmain: 2 Story's Eq. Jur., sect. 297; Perry on Trusts, sect. 216. Whether the testator held communication with the devisee or not, the intention of creating an honorary trust would avoid the devise of the legal estate: 1 Jarm. on Wills 245; Boson *v.* Stathan, 1 Eden 512; Gressley's Eq. Ev. 208; Shelford on Mortmain 143, 144, 145 n. 5, 147, 153; Edwards *v.* Pike, 1 Eden 267; Newton *v.* Pelham, Id. 514; Stickland *v.* Aldridge, 9 Vesey 516; Willard *v.* Hawthorn, 2 B. & Ald. 96; Doe *v.* Wright, Id. 721. The law as to devises for charities cannot be overturned by subtleties: Price *v.* Maxwell, 4 Casey 33; Wilmot Notes 64; Chesterfield *v.* Janssen, 2 Vesey, Sr. 165. Direct co-operation in the original transaction is not essential: Magniac *v.* Thompson, 7 Pet. 348. The Act of April 22d 1856, sect. 4, Pamph. L. 533, 1 Br. Purd. 724, pl. 3; Sechrist's Appeal, 16 P. F. Smith 237; Boynton *v.* Housler, 23 Id. 453; Maffit *v.* Rynd, 19 Id. 381; Russel *v.* Jackson, 10 Hare 204.

*B. M. Boyer*, for appellee.—It would be against the letter and policy of the Wills Act of April 8th 1833, to vary a devise by parol: Wallize *v.* Wallize, 5 P. F. Smith 242; Alter's Appeal, 17 Id. 341; Derr *v.* Greenawalt, 26 Id. 239. Parol testimony as to wills is not admissible except in cases of ambiguity: Wigram on Wills 48, 97–99; O'Hara on Wills 29; Hampshire *v.* Pierce, 2 Vesey, Sr. 216; Standen *v.* Standen, 2 Vesey, Jr. 589; 1 Jarm. on Wills 279. The Act of 1855 is to receive the same construction as the Statutes of Mortmain: 9 Geo. II., c. 36; McLean *v.* Wade, 5 Wright 266. If a devisee had by fraud induced the

testator to give him the estate absolutely with the understanding he would hold it in trust for a charity, the devisee would be treated as a trustee, but if there were no fraud or mistake it would not be so : Adlington *v.* Cann, 3 Atkins 144.   So if the intention of the testator had not been communicated nor his wishes known to devisee, who assumed no obligation in regard to them: Stickland *v.* Aldridge, 9 Vesey 516 ; Lomax *v.* Ripley, 3 Sm. & G. 48. There must be a contract or trust to avoid the gift: Paine *v.* Hall, 18 Vesey 475 ; Walgrave *v.* Tebs, 2 Kay & Johns. Ch. 313.

Mr. Justice SHARSWOOD delivered the opinion of the court, January 31st 1876.

The very able and exhaustive opinions, as well of the auditor as of the learned court below, have relieved us from an examination of the English decisions upon the Mortmain Act of that country. They undoubtedly throw a clear and strong light upon the question presented upon this record.   They establish two positions : 1. That if an absolute estate is devised, but upon a secret trust assented to by the devisee, either expressly or impliedly, by knowledge and silence before the death of the testator, a court of equity will fasten a trust on him on the ground of fraud, and consequently the Statute of Mortmain will avoid the devise if the trust is in favor of a charity.   But 2. If the devisee have no part in the devise, and no knowledge of it until after the death of the testator, there is no ground upon which equity can fasten such a trust on him, even though, after it comes to his knowledge, he should express an intention of conforming to the wishes of the testator.   The latter proposition applies directly to the case now before us.   Reuben Yeakle, the legatee named in the will, was not present when the instrument was executed.   He had no communication with the testator, directly or indirectly, upon the subject.   The testator had long intended to leave his estate for charitable purposes.   On his death-bed he sent for a scrivener, and expressed to him his wish to have his property so disposed of after his death.   He was informed that if he should die within thirty days, such a disposition would be ineffectual, but that he might make an absolute bequest to some individual, upon the confidence and belief that when he should be informed of his wishes, he would, of his own accord, carry them out.   This plan was adopted, and upon the suggestion of one of the bystanders, Reuben Yeakle, the bishop of the church to which the decedent belonged, was chosen by him.   It is clear, not only from the evidence, but from the verdict of the jury in the issue of *devisavit vel non*, that no undue influence was exercised to procure the will.   It was the testator's own free and voluntary act, and he was told "that he could dispose of his property to a particular person unconditionally, and if that man would do it, then he could put it to those places where he wanted it; but that would be

entirely at his option; he could do it or not." Reuben Yeakle was not informed of the will until some time after the death of the testator. When informed of it he declared his intention to appropriate the money as the testator wished it to be. He said, when examined as a witness before the auditor: "I have not seen the will, but if it gives me the absolute right to the property without condition, I should consider that I had the legal right to do with the property as I pleased. I draw a distinction in this case between the legal and moral right."

We are unshackled by authority upon this question. The English precedents upon the construction of their Statute of Mortmain are not binding upon this court, and with us the question is an entirely new one. By the 11th section of the Act of Assembly of April 26th 1855, Pamph. L. 332, it is provided, "that no estate, real or personal, shall hereafter be bequeathed, devised or conveyed to any body politic, or to any person, in trust for religious or charitable uses, except the same be done by deed or will, attested by two credible and at the time disinterested witnesses, at least one calendar month before the death of the testator or alienor, and all dispositions of property contrary hereto shall be void, and go to the residuary legatee or devisee next of kin or heirs according to law."

It seems very clear that the bequest in the will of Frederick Schultz to Reuben Yeakle is not within the words of the statute. There is nothing in the circumstances to fasten a trust upon him. The statute out of the way, the charities intended to be benefited would have had no claim, legal or equitable, to enforce payment by him to them. He would, in the eye of the law, be guilty of no fraud, legal or equitable, either against them or the testator, if he should, even at this day, change his intentions and apply the money to some other use. Being the absolute owner, under the will, the declaration of his intention would not be binding upon him. It is not, therefore, in the words of the statute, a bequest " to a body politic or to any person in trust for religious or charitable uses." Had Reuben Yeakle been present when the will was executed, or the objects of the bequest been communicated to him before the testator's death, and he had held his peace, there would have been some ground for fastening a trust upon him *ex maleficio*, as in Hoge *v.* Hoge, 1 Watts 163. But nothing of that kind can be pretended here.

It has been contended, however, very strenuously, that as Edward Schultz proposed Reuben Yeakle to the testator as the man, the acceptance of Reuben Yeakle of the bequest recognised Edward Schultz as his attorney, and ratified whatever he had said and done. They urge the maxim, *omnis ratihabitio retrotrahitur et mandato æquiparatur*. It is a very ingenious contention, but unfortunately for the appellants, there is nothing in the evidence

upon which it can be built.   Edward Schultz did not undertake
for Reuben Yeakle; he gave the testator no assurance that he
would accept and carry out his intentions when made known to
him.   He says : " I proposed Reuben Yeakle, so far as I remem-
ber, for the man.   Frederick then agreed to Reuben Yeakle.
Reuben Yeakle was considered to be an honest man, and it was
for this reason he was taken, and because he was acquainted with
these societies mentioned."   " As far as I can recollect, I said,
that through Yeakle his desire could be carried out in the distribu-
tion of his property."   " The object was to carry out the wish of
Frederick in that way.   There was a chance to carry it out in
that way if the legatee was willing, and Reuben Yeakle was selected
because it was thought he would agree to it."   There is nothing
in all this which indicates any promise or assurance by Edward
Schultz to the testator that Reuben Yeakle would accept the
bequest in trust for the charities.   There was the mere expres-
sion of an opinion, concurred in by the testator, that when the
legatee came to understand the object and purpose of the bequest
to him, as an honest man he would carry out the intention of the
testator.

It is urged, however, that this whole plan is nothing but a con-
trivance to evade the statute.   No doubt such was the intention
of the testator.   It is said that it is a fraud upon the law, and that
the bequest ought therefore to be declared void.   But that over-
looks the fact that the absolute property in the subject of this
bequest has vested in the legatee, and that he is entirely innocent
of any complicity in the fraud of the testator.   If the statute is
practically repealed by this construction it is evident that it must
be for the legislature to devise and apply a remedy, not the judici-
ary, whose province is not *jus dare* but *jus dicere.*

Decree affirmed and appeal dismissed at the cost of the
appellants.