## Stirk's Estate.

*Will—Charitable bequest—Death within thirty days—Alternative bequest—Fraud.*

1. Where a woman executes her will by which she gives her residuary estate, amounting to $340,000, to a charity, and immediately thereafter executes a codicil in which she states that as there may be a question of the legality of the bequest to the charity if she dies within thirty days from the date of her will she revokes the gift to the charity and gives her residuary estate to a trust company, such gift to the trust company cannot be sustained, where it appears that the trust company in question was a stranger to testatrix, that she was not a stockholder therein nor a depositor, that the will and codicil were prepared by an assistant trust officer of the company, that the codicil was prepared with the name of the residuary legatee left blank, that when the scrivener asked the testatrix to whom she wished her residuary estate to go in case of her death within thirty days, she said:

"Give that to the company," naming the trust company, and that both the testatrix and the scrivener must have intended, without openly stating it, that the gift to the trust company was simply to meet the requirements of the law and carry the bequest to the charities designated in the will.

2. In such a case the action of the scrivener constituted a constructive fraud which would prevent the trust company from reaping a benefit from it, although the company did not in any way participate in the fraud.

3. No person can claim an interest under a fraud committed by another. However innocent the party may be, if the original transaction is tainted with fraud, that taint runs through the derivative interest, and prevents any party claiming under it.

Argued March 21, 1911.   Appeal, No. 360, Jan. T., 1910, by Oliver D. Wood et al., from decree of O. C. Phila. Co., Jan. T., 1910, No. 377, dismissing exceptions to adjudication in Estate of Elizabeth Ivins Stirk, deceased.   Before FELL, C. J., BROWN, POTTER, ELKIN and STEWART, JJ. Reversed.

Exceptions to adjudication.

At the audit it appeared that the residuary estate was claimed by Oliver D. Wood and William B. Wood, the brothers and only next of kin of the testatrix, upon the ground that the bequest of the residuary estate to The Land Title & Trust Company under the codicil to the will was invalid, because of the legal incapacity of The Land Title & Trust Company to take and also because this bequest of the residuary estate was an illegal attempt to violate sec. 11 of the act of April 26, 1855, the testatrix having died four days after the execution of the will and codicil.

The auditing judge, ANDERSON, J., decided in favor of The Land Title & Trust Company.   Exceptions filed by Oliver D. Wood and William B. Wood were on October 18, 1910, argued before Judges DALLETT, LAMORELLE and ANDERSON.   On December 3, 1910, an opinion was filed by LAMORELLE, J., dismissing the exceptions; and at the same time a dissenting opinion was filed by DALLETT, J.

On December 7, 1910, a formal decree was entered dismissing the exceptions and confirming the adjudication.

The facts appear by the opinion of the Supreme Court.

*Error assigned* was the decree of the court.

*Alfred R. Haig,* with him *Henry C. Thompson, Jr., William F. Harrity, Solomon F. Glenn* and *Edwin F. Glenn,* for appellants.—To sustain the bequest of the residuary estate, to The Land Title & Trust Company, under the codicil, is to violate sec. 11 of the Act of April 26, 1855, P. L. 328: Schultz's App., 80 Pa. 396; Hodnett's Est., 154 Pa. 485; Kessler's Est., 221 Pa. 314; Price v. Maxwell, 28 Pa. 23; Jeanes's Est., 228 Pa. 537; Fetterhoff's Est., 228 Pa. 535; Paxson's Est., 221 Pa. 98; Gray's Est., 147 Pa. 67; Gregg's Est., 213 Pa. 260.

*John G. Johnson,* with him *Maurice Bower Saul,* for appellees.—There was no violation of the act: Flood v. Ryan, 220 Pa. 450; Schultz's App., 80 Pa. 396; Hodnett's Est., 154 Pa. 485; Jones v. Badley, L. R. 3 Ch. App. Cases, 362; Rowbotham v. Dunnett, L. R. 8 Ch. Div. 430.

OPINION BY MR. JUSTICE STEWART, May 23, 1911:

The question we have to determine is, whether under the evidence submitted, a secret trust attaches to an alternative bequest, which by the terms of the will was to become effective in case the testatrix died within thirty days after the execution of her will. The appeal is by the brothers and next of kin of the testatrix from a decree of the orphans' court of Philadelphia county adjudicating the account of the executors and trustees, and awarding the fund absolutely to the residuary legatee named in the will. The claim made on their behalf is that the bequest though in terms absolute, was made with a tacit understanding that in case the charitable bequests contained in the will failed by reason of death within thirty days from the date of the execution of the will, the alternative

residuary legatee would appropriate the fund received to their payment. The case is an exceptional one on its facts. Fortunately these are not in dispute. The testatrix, Mrs. Elizabeth Ivans Stirk, was a married woman, wife of Dr. James C. Stirk, of Philadelphia. She had been twice married but was childless, and her nearest kin surviving are two brothers, these appellants. With her surviving husband she had an antenuptial contract limiting and defining his interest in her estate. She made her will in immediate contemplation of a very serious surgical operation upon herself which she apprehended might be attended with fatal results. The will was prepared by Mr. Simpler, assistant trust officer of The Land Title & Trust Company, a corporation appointed one of the executors, and made also the alternative residuary legatee under the will. Mr. Simpler's assistance in the matter was invited in this way. A year or so before he had aided Mrs. Stirk in the settlement of her share in the estate of her first husband. In the course of that business he had suggested to her the importance of herself making a will, and had endeavored, without success, to overcome her objections. So when the emergency of her illness arose, she sent for him. He visited her on the afternoon of Saturday, January 9, 1909. She then told him of her physical condition and her apprehension as to the result, and requested him to prepare a will for her to execute. She acquainted him fully and exactly with the disposition she desired to make of her estate, devoting it largely to charitable, educational and religious uses. From the memoranda taken at this interview he prepared the will and codicil thereto the following day (Sunday), and on Monday morning called upon Mrs. Stirk, when both will and codicil as he had prepared them, with the exception hereafter noted, were duly executed. The will proper as prepared by Mr. Simpler, was executed without any change whatever. In the thirteenth item it gave to St. Joseph's Hospital in Philadelphia the sum of $5,000; in the fourteenth, to the Presbyterian Home for Aged Couples and Aged Men, located at Bala, $25,000;

in the sixteenth, to the University of Pennsylvania, $100,000; in the fifteenth, to her husband, "in pursuance of the antenuptial contract" $100,000; in the eighteenth, her residuary estate to her executors in trust, to pay annuities for life as follows: $8,000 annually to her husband, Dr. James C. Stirk; $3,000 annually to her brother, Oliver D. Wood; $500 annually to her brother, William B. Wood; a like sum to Oscar Miller, and $260 annually to her friend, Mrs. William D. Summers. This further provision follows: "And as to the residue of the said net income, and upon the death of the said annuitants, as to the amount heretofore paid to them respectively, to pay over the same to the University of Pennsylvania for the general purposes of said University.

"And upon the further trust, upon the death of the last survivor of the said annuitants, in trust to pay over, transfer and deliver the whole of my residuary estate as it may then be constituted unto the University of Pennsylvania."

The codicil as prepared by Mr. Simpler was as follows: "Whereas there may be a question as to the legality of the bequests to the University of Pennsylvania and to the charities named as beneficiaries in my said will in case of my death within thirty days after the date of said will, now in case I shall die within thirty days after this date, I hereby revoke the said bequests to St. Joseph's Hospital of five thousand dollars, to the Presbyterian Home for Aged Couples and Aged Men located at Bala, of Twenty five thousand dollars, to the University of Pennsylvania of One hundred thousand dollars, and the residuary bequests to the said University of Pennsylvania, and in lieu thereof, I give, devise and bequeath the sum of One hundred and thirty thousand dollars to          .

"And as to the rest, residue and remainder of my estate, and after the termination of the annuities as provided in my said will, I give and devise and bequeath the same to          ."

The only change made in the codicil before execution

was the insertion of the name, Dr. James C. Stirk, in the first blank appearing above, and the name The Land Title & Trust Company in the second.

This brings us to the material inquiry in the case; and that our recital of the facts in connection therewith may be entirely accurate we shall quote from the record the testimony of the several witnesses. Mr. Simpler, the scrivener, having testified that on writing up the will in accordance with the instructions Mrs. Stirk had given him on Saturday night, it occurred to him that in case the operation contemplated should prove fatal the charitable bequests would fall, and that he therefore prepared a skeleton of a codicil, and took that with the will; that the will was entirely satisfactory, and was executed, and that then the codicil was taken up; his further examination proceeded as follows: Q. "Had she, [testatrix] given you any instructions about the codicil prior to that?" A. "She had not." Q. "The codicil, then, was your suggestion?" A. " Was my suggestion, to take care of the possible intestacy, because she had expressed herself to me as having provided for everybody in whom she had any interest, under the terms of the will, including the money to go as the residuary clause provided." Q. "In preparing the codicil, you prepared it as a skeleton, with the names of the beneficiaries blank? " A. "Exactly." Q. " At the time you received your instructions as to the preparation of the will, was anything said as to the alternative bequests under the codicil?" A. "Nothing." Q. "The codicil was not referred to?" A. "The codicil was not referred to, because as I say, the possible fatal termination of the operation did not occur to me until I sat in the quiet of my office on Sunday night and had the will prepared." Q. " When you went back with the skeleton of the codicil, what did you say to her in connection with that?" A. " I told her that in case of her death within thirty days, the law said that a gift to a charity was void, and that the law also said that a gift to any person in trust to pay to a charity was void; and that therefore it became necessary

for her to consider to whom should go the amounts which she had given to charities, and the residuary amount which was to have gone to the university without any relation of trust being implied or expressed." Q. "Was the codicil prepared and ready for execution before the will had been executed?" A. "The codicil was all prepared in type-writing, with, as I say, a skeleton. I have had the will brought up from the Register's Office." Q. "Had the blanks been filled in?" A. "No, they were not filled in prior to the execution of the will." Q. "After the will had been executed, what was done with the codicil?" A. "After the will was executed, I said, 'Now, it is necessary to take up the question of the codicil, as to what, in case of your death within thirty days, you wish done with the charitable bequests of $130,000, and the ultimate residuary bequests after the annuities fall in;' and at that time, the will having been executed, the witnesses to the will were present. I read over the codicil and came to the first blank, and I said 'To whom do you wish the $130,000 to go, in case the will shall be null as to that?' 'Oh,' she said, 'give that to Jim.' I said 'You fill in Dr. Stirk's name,' which she did in her own handwriting." Q. "Was Dr. Stirk present at that particular moment?" A. "He was not present at that time. And I also had her initial it. And then the question came as to the residue of the estate after the termination of the annuity, and I read over that clause and asked her to whom she wished that to go, and she said, 'Give that to the Land Title Company.'" Q. "Had you made any suggestion to that effect?" A. "I said 'You write that in,' and she asked if she had to write all that in, and I said I would write it if she initialed it; and that is what was done, and then the codicil was signed by her, and I asked her if she acknowledged it as a codicil to her will, and she did so in the presence of the witnesses and they signed and left." Q. "Now, when the name of the Land Title Company was suggested as the residuary devisee and legatee, was there any conversation as to the character of that bequest, except that it

was to be absolute?" A. "There was none." Q. "Were there any instructions given?" A. "There were not." Q. "Had you called her attention, or had you called to her mind any decision of the Supreme Court bearing on a case of that kind?" A. "I had not." Q. "The gift was made, as you say, without any intimation from her as to the object of it and without any suggestion or direction as to the ultimate disposition of that property?" A. "Absolutely."

Mr. Simpler had brought with him two of his assistants in the trust company to attest the execution of the will. They were not introduced into the room where testatrix was until after the conversation between Mr. Simpler and the testatrix has occurred, and their testimony was confined to the act of execution. John F. Case, one of these, testifies that together they were called in to attest the will; that having subscribed as witnesses to the will proper they remained in the room while Mr. Simpler took up the matter of the codicil. This witness was then asked the question, "Now tell us what you heard, so far as you remember?" His answer was: "After the clause in the codicil where the bequest of $130,000 is revoked, Mrs. Stirk requested Dr. Stirk's name to be inserted, after which she requested Mr. Simpler to run his pen through the words immediately following Dr. Stirk's name, which he did, and Mrs. Stirk put her initials on the margin, and after that she suggested that the residuary estate be left to the Land Title & Trust Company." Q. "What was the conversation between Mrs. Stirk and Mr. Simpler— what did each of them say—at the time in your presence in relation to the codicil?" A. "As I remember, there was not much conversation. I think Mr. Simpler spoke something to this effect—as to whom should this residuary estate be left, and she said, 'the Land Title & Trust Company,' and then he asked her to write the Land Title & Trust Company's name in the codicil, to which she demurred, it being a long name, and Mr. Simpler said he would write the name in if she would put her initials on

the margin." Q. "Who wrote the name of Dr. Stirk in?" A. "Mrs. Stirk." Q. "Was there any suggestion made by Mr. Simpler leading up to the entering of these names in the codicil?" A. "None that I heard, no."

The testimony of the other attesting witness, Mr. Glenn, was to the same effect. Dr. Stirk, the husband, testified that he was present when the name of the Land Title & Trust Company was inserted in the codicil. He was asked, Q. "Can you give us any conversation that took place at that particular time?" A. "The only conversation that I can recall is when Mr. Simpler said, 'Now, there is a residue, what shall we do with that?' and she says, 'Oh, give that to the Land Title Company?'" Q. "Just in that way?" A. "She remarked at the same time that she had made provisions for every one else that she cared anything about, and she would give that to them." Q. "Did she give any direction as to how they should dispose of it?" A. "None whatever; just simply ordered it to be given to the Land Title Company." Q. "Did you suggest anything to her?" A. "Absolutely not." Q. "Did you raise any question or make any suggestion as to the propriety of giving this to a corporation for profit?" A. "I had no reason to." Q. "Or a total stranger?" A. "Absolutely none."

We have been careful to recite all the testimony bearing upon the immediate question with which we have to deal. These additional facts, however, appear in the case, which are to be noticed. The estate which was disposed of under this will the testatrix had derived in most part, if not wholly, from her first husband; she was not a stockholder in the trust company, and so far as appears was not even a depositor; and again, so far as appears, she was unacquainted with anyone interested in it except Mr. Simpler; and still again, the Land Title & Trust Company is neither a religious nor charitable, nor educational institution, but one exclusively for profit. The first question that naturally arises is, why should the testatrix, whose governing desire and evident purpose, as declared in her will,

was to devote such a large part of her estate to charitable and educational uses, choose as an alternative recipient of her bounty, in case her original disposition failed, by operation of law, a corporation which needed no assistance, whose usefulness as a public convenience could in no way be promoted by private benefactions, and which was incapable at law of engaging in charitable, educational or religious enterprises, rather than kindred for whom she had affectionate regard, as evidenced by her will? Were this an inquiry as to her testamentary capacity, the circumstance stated would properly call for consideration. It is quite as relevant here though in a different connection, not as a challenge of the testatrix's jus disponendi, but because it is a testamentary disposition not only unusual, but so contradictory to the main purpose expressed in the will proper, and so inexplicable by the ordinary rules which regulate and control human conduct and feeling, that, if the entire sanity of the testatrix be conceded, as it must be, it suggests at least a suspicion that the words of the will leave something of the intention of the testatrix unexpressed. The will, aside from the codicil, disposed of her entire estate, and expressed her governing desire and purpose. The codicil was prepared by the scrivener without consultation with the testatrix, to meet a legal contingency which, after preparing the will, had occurred to him, but not to the testatrix, as possible. It is no strained inference from the testimony of Mr. Simpler that the testatrix knew nothing whatever of the requirements of law in the matter of charitable bequests until he submitted to her the codicil for execution. Assuming, as we have a right to do, that she was a person wholly uninformed in this respect, the information she received from him, while it might have been enlightening to one who had some previous knowledge of the law of mortmain, can hardly be said to have been so instructive as to impart to this testatrix an intelligent understanding of legal requirements. What he told her, and all he told her, was that in case of death within thirty days the law said that

a gift to a charity was void, and that the law also said that a gift to any person in trust to pay a charity was void; and that therefore it became necessary for her to consider to whom should go the amounts which she had given to charities, and the residuary amount which was to have gone to the university without any relation of trust being implied or expressed. While it cannot be said that this was a misdirection in terms, we yet incline strongly to the view that it was so in effect, and produced a testamentary act the legal effect of which was wholly misapprehended by the testatrix. She certainly understood from what was told her that in the event of her death within thirty days following, the charities she had provided for in her will would fail, as the will then stood; but we think quite as certainly she understood from what followed that the codicil provision was introduced, not as a substitutionary gift absolute, but as a means of effectuating in any event her intention as expressed in the will proper. There is in the instruction given not a word of warning or caution that failure of the charities in the event of death within the statutory period, would be incurable; that the takers by the alternative gift proposed would take absolutely in their own right, with power to make whatever use of the property they chose, to give it to the charities she sought to promote or withhold according to their own pleasure. The instruction, as one unskilled would most likely understand it, related to matter of form for the accomplishment not of other but the same ends as those she contemplated in the original will, only in another way. Had Mr. Simpler there stated to her that under the proposed alternative gift, if she did not survive, the Land Title & Trust Company would have the right to take and receive for its own her entire residuary estate amounting to upwards of $340,000, and add it to the company's surplus for the enrichment of its stockholders, none of whom she knew so far as appeared, can anyone doubt that she would at once have disclaimed any such intention or purpose? The promptitude with which she acted in designating the alternative beneficiary

in answer to the scrivener's inquiry, and her entire indifference and want of consideration as expressed in her reply, "Oh, give that to the Land Title Trust Company" strongly indicated an understanding on her part that she was selecting the company, not as a beneficiary, but as a medium through which the charities she had indicated would receive her bounty.

But her understanding and intention while important are not decisive of the question. Mere expectation on her part that the trust company, in case the gift to it became effective, would dispose of the property to and among the charities she had designated, would not convert what by its terms is an absolute gift into a trust. The assent of the party to whom the gift is made must appear as well. "If an absolute estate is devised, but upon a secret trust assented to by the devisee, either expressly or impliedly, by knowledge and silence before the death of the testator, a court of equity will fasten a trust on him on the grounds of fraud and consequently the statute of mortmain will avoid the devise if the trust is in favor of a charity. If the devisee has no part in the devise and no knowledge of it until after the death of the testator, there is no ground upon which equity can fasten such a trust on him even though, after it comes to his knowledge, he should express an intention of conforming to the wishes of the testator:" Schultz's App., 80 Pa. 396.

It follows that however much this testatrix misapprehended the legal effect of her testamentary act, except as her misapprehension was designedly encouraged by another, it is too late to correct the mistake. We turn now to the acts and conduct of the scrivener in connection with the transaction. If it be found that he knew or had reason to believe, that the testatrix was executing the codicil he prepared in the belief that the gift to the trust company, though absolute on its face, was but a method adopted to secure in any event her gift to the charities designated in the will, and kept silence, the law will charge him with assent and acquiescence and will imply a trust arising from

the gift absolute. The transaction would then take on the aspect of constructive fraud even though all the gain and advantage resulting therefrom were to accrue to another. So we are not concerned in our inquiry with the Land Title & Trust Company. There is not the slightest evidence of its participation, nor is it necessary that there should be in order to fasten upon it a trust. That company here appears as a claimant to the fund in its own right; but it stands just where Mr. Simpler would have stood had the gift been to him. "No person can claim an interest under a fraud committed by another. However innocent the party may be, if the original transaction is tainted with fraud, that taint runs through the derivative interest, and prevents any party claiming under it." This was said by Lord Justice TURNER in a case closely resembling this, Russell v. Jackson, 10 Hare 204. We repeat, the vital inquiry in the case is, did Mr. Simpler know or have reason to believe that this testatrix understood from what he had told her that the gift to the trust company was simply to meet the requirements of the law, and carry the bequests to the charities designated in the will? We have in another connection pointed out those features of the case which made it exceptional. The one above all others calculated to surprise, is the fact of the gift of upwards of $340,000 to a trust company whose business is that of making money for the profit of its stockholders, too abundantly established to require aid, and in which the testatrix was absolutely without interest, and towards which she stood as an entire stranger. When the testatrix in reply to the question, "To whom do you wish that to go?" said, "Oh, give that to the Land Title & Trust Company," we think we speak for the average or ordinary scrivener when we say, that if he knew the character of the beneficiary proposed, he would have been startled by the reply, and his mind would at once have opened to a suspicion that the testamentary act had been too long delayed and that mental disturbance had intervened. Except as a purpose to use the trust company

simply as a trustee was known, the ordinary scrivener would at least have repeated his inquiry to make certain that he had correctly understood what had been said. If so much would naturally have been expected of the ordinary scrivener, how much more would reasonably be expected of one so experienced and qualified as Mr. Simpler, who tells us himself that as assistant trust officer he had long been accustomed to write wills; especially in view of the fact that the gift was to the company with which he was closely connected? Certainly to such an one should have come a quicker and surer apprehension of the actual situation, disclosing more than enough to excite suspicion or misapprehension, either on his own part or on the part of the testatrix; and from such an one we would naturally expect further inquiry and instruction before the testamentary act was committed. Here neither inquiry nor instruction followed, but the writing in the blank space the name of the Land Title & Trust Company followed without question immediately upon the reply. Mr. Simpler is careful to say that he had no communication with the testatrix as to the character of the bequest to the trust company, except that he told her it was to be absolute; that the gift was made without any intimation as to her object in making it, and without suggestions of directions as to the ultimate disposition of it. It is to be noted that he is no less careful to avoid saying what his own understanding of the purpose of the testatrix in making the bequest absolute was. Although the confidential adviser of the testatrix, and fully competent, he had not given her advice and instruction, with reference to the necessity of the codicil which he had prepared, and the meaning of its provisions, sufficient to prevent a probable or even possible misapprehension on her part. This much we think is clear, and we fail to see why what must be so manifest to others, was not apparent to himself. We can only interpret his failure to proceed further with instructions to the testatrix, with words of caution and warning, and his silence when he should have spoken, as

studied effort on his part to defeat the true spirit of the law by avoiding all utterance which might thwart his purpose to create a trust, and thereby accomplish by indirection that which the law would otherwise disappoint.

Upon a review of all the testimony, and having in mind the situation and surroundings of the testatrix, the character of the gift to the trust company, which if absolute, in the language of the learned auditing judge, is "incomprehensible and almost incredible," we are constrained to the conclusion that it was the understanding of both the testatrix and Mr. Simpler, notwithstanding that neither communicated in words such understanding to the other, that the bequest to the Land Title & Trust Company, though by its terms absolute, was with a purpose to secure to the charities designated in the will the bequests therein given them, in any and every event; and that nothing more was intended than that the trust company should be a medium of transmission. It follows that it is as though the bequests were given directly to the charities, and the testatrix having died within thirty days from the execution of the will, the bequest falls and so much of the estate is to be distributed under the intestate laws of the state.

We are quite aware that the case upon its facts is without exact parallel; nevertheless, its main and essential features bring it within the operation of established and familiar principles, and these we have applied. With the statute out of the way we would hold without question that the absolute bequest to the trust company was impressed with a trust for the charities. For the reasons given the decree in this case awarding the fund to the Land Title & Trust Company is reversed, and the record is remitted for distribution of that fund in accordance with the views here expressed.