# Bickley's Estate.

*Wills—Charity—Alternative gift to charity—Promise of distributee—Act of April 26, 1855, P. L. 382—Stare decisis.*

1. An alternative gift to charity, made by a testator for the purpose of evading the provisions of section 11 of the Act of April 26, 1855, P. L. 382, will not be held void, if he dies within one calendar month after the execution of his will, if the distributee has made no promise, express or implied, to give the fund to charity, even though he actually does so give it.

2. This conclusion is reached solely upon the ground of stare decisis; the legislature, owing to the lapse of time since the rule was first amended, being now the only body which can properly grant relief therefrom.

Argued January 7, 1921. Appeal, No. 50, Jan. T., 1921, by Arthur Wharton Bickley, cousin of decedent, from decree of O. C. Phila. Co., April T., 1918, No. 31, dismissing exceptions to adjudication, in estate of Lawrence Wharton Bickley. Before FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Exceptions to adjudication of LAMORELLE, P. J.

The opinion of the Supreme Court states the facts.

The court in an opinion by HENDERSON, J., dismissed the exceptions. Arthur Wharton Bickley, cousin of deceased, appealed.

*Error assigned,* inter alia, was decree, quoting it.

*Thomas Ridgway,* for appellant.

*James Wilson Bayard,* of *Prichard, Saul, Bayard & Evans,* with him *Thomas Stokes,* for appellee.

OPINION BY MR. JUSTICE SIMPSON, March 28, 1921:

Lawrence Wharton Bickley died May 18, 1917, having, while seriously ill, made his last will and testament, dated April 25, 1917, wherein he specified that the sum of $50,000 and his residuary estate, should be held by his executors in trust to invest the same and to pay the net income thereof to the Academy of the Protestant Episcopal Church of the city of Philadelphia, for the purpose of founding certain scholarships therein, with a proviso that if the academy could not or would not accept the gifts, or thereafter was dissolved, the bequests should go to certain other specified charitable or religious uses. On the same day he executed also the following codicil, which he stipulated should be destroyed if he lived longer than thirty days: "Should I die within thirty days after the date of said will, then and in that event, as to any provisions thereof which would fail to take effect by reason of such decease, I give, devise and bequeath that portion of my estate to Philip Mercer Rhinelander of Philadelphia." Mr. Rhinelander then was and still is the bishop of the Protestant Episcopal Church in the State of Pennsylvania.

Testator died within a calendar month after the making of his will, and on the audit of the account Arthur Wharton Bickley, appellant here and one of testator's

next of kin, objected that the charitable gifts made by the will were void, under section 11 of the Act of April 26, 1855, P. L. 328, because testator died within a calendar month after its execution; and that the codicil was also void because it was an attempt to evade the law and give to the academy indirectly that which the testator could not give directly.

Testimony was taken, resulting in findings of fact as follows: "The bishop did not know the decedent, Lawrence Wharton Bickley, and had never had any communication with him whatever. Since Mr. Bickley died, the bishop has become acquainted with the fact that by a codicil to the will the entire residuary estate is left to him, the bishop. He recognizes no legal obligation to dispose of it in any way, save and except in his discretion. He is glad, however, because of what he considers a moral obligation, to carry out the intention of the testator so far as it seems wise and right so to do. Because of this recognition of the moral obligation, the bishop has executed a deed of trust......which, in effect, carries out the purposes and intention of the testator with reference to the Protestant Episcopal Academy. In no way did the bishop ever suggest that representation should be made to Mr. Bickley with reference to this alternative bequest, nor did he authorize anybody so to do."

Upon the facts thus found, the auditing judge awarded the fund in dispute to Bishop Rhinelander; appellant excepted thereto; the exceptions were dismissed and the adjudication confirmed absolutely, and this appeal followed.

The evidence in the case fully justified the facts as found; and the conclusion reached inevitably resulted, if nearly all the decisions elsewhere under similar statutes, and our own prior rulings, are to be sustained: Schultz's App., 80 Pa. 396; Hodnett's Est., 154 Pa. 485; Flood v. Ryan, 220 Pa. 450; Stirk's Est., 232 Pa. 98. It is true that in the latter case the alternative gift,

made by the codicil, was declared void, but the substantial basis of the opinion, despite certain general expressions therein, was that, as the draughtsman of the will who was also an officer of the alternative distributee, and then knew that testator's "purpose [was] to secure to the charities designated in the will the bequests therein given them in any and every event, and that nothing more was intended than that the trust company should be a medium of transmission," his silence was, under all the authorities, equivalent to an agreement to carry out this purpose, and raised a trust in favor of the charities, which the statute thereupon declared void because of testator's death within a calendar month.

✓ If the question involved was an open one with us, or if it was of modern determination, we would reverse the decree in the present case, for the following reasons: (1st) The decisions are wrong in principle in that they make valid admitted attempts to evade the public policy of the Commonwealth as expressed in her statutes: nemo potest facere per obliquum quod non potest facere per directum. (2d) In Kessler's Est., 221 Pa. 314, 320-1, summarizing previous decisions, we said: "The Act of 1855 is a remedial statute, and should be construed so as to give effect to the purpose for which it was enacted. While charities may be said to be favorites of the law, .....yet the law discourages such gifts at or near the time of impending death, when the mental faculties are impaired, the will power broken and the vital forces weakened; because, under such circumstances, the importunities of designing persons, or the terrors of final dissolution, may induce dispositions of property contrary to natural justice, and without regard to the ties of kinship, which, under normal conditions, would be operative on the mind of the testator." These conclusions being correct, as indeed the act itself proclaims them to be, then the decisions now under consideration, and those of like effect elsewhere, enjoy the unique and unenviable

distinction of applying the law to cases which are not within its spirit and purpose, and of refusing to apply it to those which are; for as to the wills of persons made less than one calendar month before death, but while they are in perfect health, "when the mental faculties are [not] impaired, the will power [is not] broken, and the vital forces [are not] weakened," all charitable gifts therein are void; whereas as to the wills of persons in extremis, when the "terrors of final dissolution" may control their every act, a lawyer or scrivener, often sent for by attending spiritual advisers, will tell them how they may successfully evade the statute and dispose of their estates to charitable and religious uses. In other matters it has been the proud boast of our ancestors and ourselves throughout the centuries, that "the reason and spirit of the law is the soul of the law," "for the letter killeth, but the spirit giveth life," 2 Corinthians 3:6. (3d) They also tempt the legatee to commit grave moral wrong by retaining to his own use, money which he knows was not intended for him. "Lead us not into temptation" is a command of the divine law and also the basis of a large part of the statute law of every civilized country; for he who tempts another to commit a tort or a crime is as guilty, in the eyes of the law, and ofttimes morally more guilty, than the man who commits it. If, in cases like the present, the legatee resists the temptation, and pays the legacy over to the charity for which it was actually intended, as every man worthy of the name does, he knowingly assists in evading the law, and thereby to a degree is led to future wilful violations thereof. (4th) The lawyer, whose office calls upon him to obey the law in letter and spirit, and the scrivener whose citizenship demands of him the same obedience, alike are tempted to advise their clients how to evade the law, instead of how to obey it; and the belief, sometimes stated, but more often acted upon without expression, that it is all right to disobey the law if you can avoid punishment for so doing, is seemingly approved by the

public generally, aided and abetted by the draughtsman whose bank account is the measure of his conscience. Thus the tendency is to debase the character of all those connected with such transactions, and there grows up in the community an inclination to obey the law only when its arm is found to be too long to make disobedience safe; results which admonish us that error is necessarily somewhere coiled up in these decisions.    (5th) In all jurisdictions, the courts, tardily recognizing the consequences flowing from their decisions allowing the law to be thus wantonly evaded, have seized upon slight circumstances in order to create a trust (Stirk's Est., supra; Russell v. Jackson, 10 Hare 204; Edson v. Bartow, 154 N. Y. 199) and then have destroyed it in order to give the estate to the heirs and next of kin, as the statute intended.    This is itself potent proof of the law's recognition of the error of its position on the main question, and has resulted in illogical distinctions which have rendered uncertain the law on this subject.    In other cases the courts have not been swift to change, by parol, written absolute estates into trust estates; nor would it be here were it not for the necessity of counteracting, as far as may be, the evasions of the public policy of the State, recognized yet approved by the earlier decisions.

Despite the cogent reasons we have thus given, and our belief that the policy of the law as expressed in the Act of 1855 is a wise one, we cannot close our eyes to the fact that, because, since Schultz's App., 80 Pa. 396, was decided on January 31, 1876, twenty-five legislatures have met and adjourned without passing an amendatory act to correct the law as there stated, and because also, as previously said, the doctrine of that case prevails in nearly all other jurisdictions where like questions have arisen, it has become so established as a guide to the handling of property that any abandonment or alteration of the understood rule should be by those fixed with the responsibility of making the law, and not by us, whose only duty is to define and construe it. We are

therefore driven by stare decisis to affirm this decree, recognizing with Lord Coke "that the known certaintie of the law is the safetie of all," and to leave to future legislatures to take such curative action in regard to the matter as to them shall seem wise.

The decree of the court below is affirmed and the appeal is dismissed at the cost of appellant.