J-A09010-15

2015 PA Super 240

| IN RE: ESTATE OF MARIO SACCHETTI, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| APPEAL OF: LINDA SACCHETTI, | |
| | No. 3443 EDA 2013 |

Appeal from the Order November 27, 2013
In the Court of Common Pleas of Philadelphia County
Orphans' Court at No(s): O.C. NO.: 1122 DE OF 2011

BEFORE: BOWES, DONOHUE, AND STABILE, JJ.

OPINION BY BOWES, J.: **FILED NOVEMBER 20, 2015**

This declaratory judgment action was instituted in the orphans' court division by Appellee Charles Sacchetti ("Charles"), in his capacity as executor of the Estate of Mario Sacchetti ("Mario"), deceased. The court ordered Appellant, Kai Mui Yau a/k/a Linda Sacchetti ("Ms. Yau"),[1] to return to the estate certain assets that she transferred to herself and assets that

_____

[1] We refer to Appellant as Ms. Yau because Kai Mui Yau is the name that Appellant used in all legal documents of record herein, including a prenuptial agreement, two checking accounts she held in joint names with Mario, checks she made payable to herself and endorsed using that name, and all deeds to real estate that she owns in this country, including the deed invalidated in the present action. Kai Mui Yau was also the name that Appellant used to obtain a marriage license in Pennsylvania and to initiate a legal action that she filed in Pennsylvania.

were transferred to her by Mario. It also declared two specific bequests to Ms. Yau in Mario's will to be void. We affirm.

This action was instituted by a petition filed by Charles in the orphans' court division of the Court of Common Pleas of Philadelphia County. In that petition, Charles asked for issuance of a citation to Ms. Yau to show cause why she should not be required to give him access to the final residence of Mario in order to administer personal property belonging to the estate. Charles averred the following. Mario, a resident of 2827 Bittern Place, Philadelphia, died testate on June 2, 2011. On June 22, 2011, Mario's will was probated and letters testamentary were granted to Charles, his nephew. The dispositive provision of Mario's last will and testament states, "I give, devise, and bequeath the following assets: Real Estate and $25,000 in cash, to my wife **Linda Sacchetti**, who has agreed to our Prenuptial Agreement, should she survive me for thirty days. The remainder of my Estate, I devise and Bequeath to my nephew, **Charles Sacchetti**[.]" Petition of the Executor of the Estate of Mario Sacchetti for a Decree giving him access to Inspect, Inventory and Take Custody of Estate Personal Property, 8/8/11, at Exhibit B (Last Will and Testament of Mario Sacchetti, 12/9/08) at 1 (emphases in original). Charles' wife and children were the alternative residual beneficiaries under Mario's will.

In the August 8, 2011 petition, Charles averred that Ms. Yau had prevented him from accessing any of decedent's personal property located in

the home. Specifically, he claimed the "alleged widow of Mario Sacchetti, Linda Sacchetti aka Kai Mui Yau" had changed the locks on the residence and, despite arrangements made through counsel, refused to allow Charles into the house.

Based upon the averments in this petition, the orphans' court issued a citation to Ms. Yau to show cause why Charles should not be permitted into 2827 Bittern Place in order to initiate administration of personal property located therein. Personal service of the citation was effectuated on Ms. Yau on October 13, 2011, at 429 Ritner Street, Philadelphia.

On November 1, 2011, Charles filed a second petition in this action, asking that the marriage between Mario and Ms. Yau be declared invalid and that the specific bequests to Ms. Yau in the will be determined null and void. That petition was amended on November 14, 2011. Therein, Charles requested that any bequests to Ms. Yau be invalidated and that certain *inter vivos* transfers made to Ms. Yau be declared void. The allegations were as follows. On December 6, 2008, Mario purportedly entered into a marriage with Ms. Yau. Three days later, on December 9, 2008, Mario executed the aforementioned last will and testament set forth. When he executed that will, Mario did so based on the "assumption and belief that Linda Sacchetti aka Kai Mui Yau was his legal spouse." Petition of the Executor of the Estate of Mario Sacchetti for a Decree Declaring the Purported Marriage of Decedent and Linda Sacchetti aka Kai Mui Yau Null and Void and that the

- 3 -

specific Bequests to Linda Sacchetti be Determined Null and Void, 11/14/11, at ¶ 7. Charles' petition outlined that the marriage was void *ab initio* because, on December 6, 2008, Ms. Yau was legally married to another man.

On December 17, 2010, two years after she allegedly married Mario, Ms. Yau "filed for divorce in the Cameron County Court of Common Pleas of Pennsylvania seeking to be divorced from one Chan Cheung Kai." *Id*. at ¶ 3. On February 16, 2011, the Court of Common Pleas of Cameron County issued a divorce decree declaring that Ms. Yau and Chan Cheung Kai were divorced. *Id*. at Exhibit D.

Two months later, on April 5, 2011, the decedent, Mario Sacchetti "filed a complaint in annulment against the said Kai Mui Yau aka Linda Sacchetti in the Philadelphia County Court of Common Pleas Family Division." *Id*. at ¶ 5. The annulment was requested due to the fact that the December 6, 2008 marriage between Mario and Ms. Yau was invalid since, at that time, Ms. Yau was legally married to another man. *Id*. at Exhibit E. Mario died less than two months later.

Mario had previously deeded to Ms. Yau the real estate mentioned in the will, which was located at 2827 Bittern Avenue. One day after Mario died, Ms. Yau negotiated two checks payable to herself; each check was in the amount of $25,000. One was drawn on a joint account owned by Mario and Charles and contained the signature Mario Sacchetti. The other check

was drawn on a joint account that required both Mario's and Ms. Yau's signatures. Charles averred that Mario's signature on both checks was forged. Charles asked the court to order the real estate and money that Ms. Yau received be returned to the estate for distribution to the residuary beneficiaries under the will.

In response, Ms. Yau filed a petition for citation to show cause why Charles should not be removed as executor of Mario's estate. Ms. Yau also answered Charles' November 14, 2011 petition as follows. Prior to their marriage, Mario and Ms. Yau entered a prenuptial agreement whereby she was to receive the house on 2827 Bittern Avenue and $25,000 if Mario predeceased her. Ms. Yau claimed that she was never legally married to Mr. Kai in Hong Kong. She reported that they resided together for "approximately fifteen (15) years and [she] held him out to be her husband." Linda Sacchetti's Answer and New Matter to the November 14, 2011 Amended Petition of the Executor, 12/5/11, at ¶ 13. They also had children together. Ms. Yau conceded that, when she entered the United States in 2002, she reported her marital status on her visa application as married. *Id*. at 3.

Ms. Yau's response also related the following. After Ms. Yau married Mario, Mario applied for a green card for Ms. Yau since the federal government permits permanent residence in the United States for aliens married to United States citizens. Ms. Yau would have qualified for a green

card if she was legally married to Mario. The United States Citizenship and Immigration Services denied her a green card on the ground that the marriage between Mario and Ms. Yau was invalid since Ms. Yau already was married to Chan Cheung Kai. Ms. Yau denied that she was married to Chan Cheung Kai and claimed that the divorce lawsuit instituted against him was a mere formality instituted so that she could obtain a green card. Alternatively, Ms. Yau averred that, even if she was married to Mr. Kai when she married Mario, her marriage to Mario became valid under 23 Pa.C.S. § 1702(a), set forth *infra*, following her February 16, 2011 divorce from Mr. Kai.

Charles thereafter filed a series of petitions against Ms. Yau. His petitions requested the orphans' court to: 1) set aside the deed whereby Mario transferred 2827 Bittern Avenue into the joint names of Ms. Yau and Mario; 2) void the prenuptial agreement and a transfer of title to a bank account at Prudential Savings Bank from Mario's sole name into the joint names of Ms. Yau and Mario; 3) order Ms. Yau to return to the estate nearly $27,000 that she stole from a bank account held in the joint names of Mario and Charles using forged checks; and 4) order Ms. Yau to return to the estate $10,000 in coins that were located in Mario's home at the time of his death.

This action proceeded to a hearing on November 26, 2012. An interpreter was present for Ms. Yau. N.T. Hearing, 11/26/12, at 4-5.[2] Charles testified as follows. Mario was his uncle and "more of a second father" to him. *Id*. at 8. Mario was born on March 4, 1925, and was married to Rita Sacchetti for twenty years, until her death. He had no children. After Rita died in 1982, Charles saw Mario at least once a week and spoke to him on the telephone three to four times a week. After 1982, Mario did not date any women and typically passed his time playing poker and creating a coin collection, which occupied one of the bedrooms in the house at 2827 Bittern Avenue. Charles, who has a bachelor's degree in accounting and business administration, took care of Mario's finances, took him to see his cardiologist, coordinated his medicines, and picked up incidental items for him.

In 2008, at age eighty-three, Mario's health began to decline. Mario introduced Ms. Yau to Charles about six months before their December 6, 2008 marriage ceremony. After they were introduced, Ms. Yau and Charles carried on regular conversations in English, and she "seemed to have no trouble understanding" Charles. *Id*. at 16. Mario told Charles that he liked Ms. Yau and had decided to marry her. Mario told Charles that the marital

_____

[2] At no point in the proceeding did Ms. Yau indicate that she was unable to understand the interpreter.

arrangement was as follows. Mario was to "help [Ms. Yau] . . . become a citizen," and would give her $25,000 and his 2827 Bittern Avenue home when he died. *Id*. at 14. In return, Mario "expected to have someone as a companion, . . . and he also expected her to take care of him, watch out for him, clean and cook." *Id*. at 14-15. Mario explained that there could be no sexual activity on his part. At the time, Mario was in his eighties, and he also suffered from congestive heart failure and diabetes. Mario nevertheless wanted the ceremony to be held in a Catholic church. Charles contacted his priest, who refused to perform the marriage ceremony since "it was really more of a business arrangement and not a marriage[.]" *Id*. at 16.

Charles recommended that a prenuptial agreement be entered. There was a delay in obtaining a prenuptial agreement because Ms. Yau did not want to reveal the extent of her assets.[3] After the prenuptial agreement

_____

[3] Those assets included:

| | |
|---|---|
| Bank CDs Approximate Value | $20,000 |
| Checking Account Approximate Value | $500 |
| Savings Account Approximate Value | $2,500 |

Real Properties in Philadelphia County, PA

| | |
|---|---|
| 429 Ritner St. Approximate Value | $150,000 |
| 730 Hoffman St. Approximate Value | $70,000 |
| 616 Fernon St. Approximate Value | $110,000 (50% ownership only) |
| 1941 S. 6th St. Approximate Value | $135,000 (50% ownership only) |

*(Footnote Continued Next Page)*

was signed, the parties obtained a marriage license; therein, Ms. Yau claimed that she had not been previously married. Trial Exhibit 1.

Ms. Yau and Mario purported to enter into a marriage on December 8, 2008; the guests included Charles, his wife, his aunt Olga, his cousin Vincent, and Ms. Yau's daughter. After that event, Charles communicated with Mario with the same frequency; Charles visited weekly and called often. Charles testified that Ms. Yau never moved to 2827 Bittern Avenue. She performed the housekeeping for a short period, but ceased performing that function soon after the marriage. N.T. Hearing, 11/26/12, at 20-21. In fact, shortly after the marriage ceremony, Ms. Yau was rarely present when

_(Footnote Continued)_ ————————

| | |
|---|---|
| 807 Snyder Ave. Approximate Value | $120,000<br>(50% ownership only) |
| Real Properties in Hong Kong,<br>People's Republic of China | |
| 2 Flats in Kowloon Approximate Value | $800,000<br>(50% ownership only) |
| Bank CDs in Hong Kong,<br>Approximate Value | $60,000<br>(50% ownership only |
| LIABILITIES<br>None | |
| INCOME<br>None (rental income only) | |

Trial Exhibit 3.

Charles visited. *Id*. at 24. Since Ms. Yau did not take Mario to his doctor appointments, Charles continued to fulfill that function.

Mario discovered that his marriage was invalid two years later after Charles took Mario to obtain a green card for Ms. Yau. Charles introduced into evidence the December 17, 2010 divorce complaint filed by Ms. Yau as well as other documents indicating that Ms. Yau was married to Chan Cheung Kai when she attempted to marry Mario. Specifically, Ms. Yau purchased 1941 S. 6th Street, Philadelphia on March 9, 2006. The grantees in the deed were "Kai Mui Yau and Chan Cheung Kai." Petition for Rule to Show Cause Why Prenuptial Agreement, Deed and Joint Bank Accounts Should Not Be Set Aside at Exhibit C; Trial Exhibit 22. Charles presented evidence that Chan Cheung Kai received mail at that residence through a postal form that indicated that Mr. Kai wanted his mail held for a period of time. In a mortgage note and in a release of mortgage for one of her properties, Ms. Yau was listed as "Kai Mui Yau, a married woman." Trial Exhibits 19, 20.

Toward the end of 2010, Mario's cardiologist told Charles not to leave Mario alone. Charles conveyed this warning to Ms. Yau, who ignored the request to stay with Mario. Charles arranged for Mario to obtain a device that alerted an ambulance if a health issue arose.

In February 2011, Mario's health began to decline rapidly, and it became evident that he would soon die. On February 16, 2011, the Court of

Common Pleas of Cameron County issued a divorce decree declaring that Ms. Yau and Chan Cheung Kai were divorced. After Ms. Yau obtained a divorce from Mr. Kai, Mario made no attempt to reaffirm the marriage. N.T. Hearing, 11/26/12, at 37. Instead, he filed for annulment. Trial Exhibit 25.

After February 16, 2011, Ms. Yau did not perform any housework and rarely visited.[4] She did not care for or provide companionship for Mario. Charles reported that, occasionally, Ms. Yau would make meals for Mario, but the majority of the time Charles and his family made sure that Mario had food. They had a small family celebration for his eighty-sixth birthday on March 4, 2011. Ms. Yau was invited, but did not attend.

After Mario died on June 2, 2011, Ms. Yau changed the locks on the house so that Charles was prevented from entering it to obtain estate property. Ms. Yau also took Mario's car, which was solely in his name and was purchased prior to the purported marriage. The car was found in front of a property owned by Ms. Yau. Charles never recovered the coin collection, which Mario had assembled prior to his December 2008 marriage to Ms. Yau.

---

[4] Charles' representations that Ms. Yau was seldom present at Mario's home and did not care or clean for him were supported by testimony from Mario's sister Olga and Charles' wife. They also confirmed Charles' report that Ms. Yau infrequently cooked for Mario.

Charles also established the following. Mario and Charles had a joint banking account at Prudential Savings Bank (number 0014512405). The account was not titled in Ms. Yau's name. On March 7, 2011, a check made payable to cash in the amount of $1,338.25 was negotiated by Kai Mui Yau. Mario's name was signed to this check. On June 3, 2011, the day after Mario died, Ms. Yau negotiated a check made payable to herself in the amount of $25,000 from that joint account. Mario's signature appeared on the signature line.

At the hearing, Charles presented J. Wright Leonard, a forensic document/handwriting examiner who was board certified by the federal, state, and local courts. Ms. Leonard opined that Mario's signature was forged on the $25,000 and $1,333.25 checks issued on the account in the names of Mario and Charles and negotiated by Ms. Yau.

In addition to the bank account owned by Mario and Charles, Mario had another bank account at Prudential Savings Bank (number 0012101713). That account originally was in Mario's name alone, but, after the marriage ceremony with Ms. Yau, he placed her name on the account. The terms of the account required both Ms. Yau and Mario to execute a check in order for it to be negotiable. On June 3, 2011, Ms. Yau negotiated a $25,000 check payable to herself on that account. Kai Mui Yau and Mario both allegedly signed that check. Ms. Leonard reported that Mario's signature on that check was forged.

In her defense, Ms. Yau denied that she was married to Chan Cheung Kai, whom she maintained was her boyfriend. However, at one point in the proceeding, she called Chan Cheung Kai her "husband in Hong Kong." *Id*. at 133. Ms. Yau also admitted that she and Mr. Kai had four children together and that he was the co-owner of two apartments that she owned in Hong Kong. The agreement of sale for one of the flats indicated that the buyers were Chan Cheung Kai and Kai Mui Yau, and immediately after her name were the words "married woman." *Id*. at 160. Finally, on her 2002 visa application to enter the United States, Ms. Yau reported her marital status as married. Ms. Yau claimed that the divorce litigation against Mr. Kai was pursued merely to obtain a green card, and that Mario asked for an annulment not to void the marriage but to reaffirm it.

Ms. Yau testified under oath that, with the exception of when she was injured in a car accident, "every day I was with Mario at home." N.T. Hearing, 11/26/12, at 142. She represented that she and her daughter did everything for Mario when he was sick and that she slept in his bed and had a sexual relationship with him. *Id*. at 135-136.

Following this evidence, the orphans' court issued a series of decrees on June 28, 2013. It considered the testimony offered at the hearing and stated: "[A]s finder of fact I found the testimony of Charles Sacchetti, Decedent's Nephew . . . to be credible, clear and convincing. On the other hand, I found the testimony of Ms. [Yau] to be wholly incredible and

unconvincing." Orphans' Court Opinion, 5/22/14, at (unnumbered page) 6. The orphans' court also specifically credited the testimony of Ms. Leonard and concluded that Mario's signature on the three checks negotiated by Ms. Yau were forged.

The orphans' court ruled that the following were null and void: 1) the marriage between Appellant and Ms. Yau on December 6, 2008; 2) the prenuptial agreement entered between Mario and Linda Sacchetti a/k/a Kai Mui Yau; 3) all gifts, devises and bequests made to Linda Sacchetti a/k/a Kai Mui Yau in Mario's will; 4) all gifts, devises and bequests made to Linda Sacchetti a/k/a Kai Mui Yau by Mario; 5) the deed dated February 27, 2009 transferring 2827 Bittern Place from Mario to the joint names of Mario and Linda Sacchetti a/k/a Kai Mui Yau; and 6) the bank document transferring Prudential Bank Account 0012101713 from Mario's name into the names of Mario and Linda Sacchetti a/k/a Kai Mui Yau. The real property, gifts, and bank account transferred to Ms. Yau were ordered returned to the estate. Ms. Yau filed exceptions to all the June 28, 2013 decrees. On November 25, 2013, the orphans' court dismissed the exceptions, and this appeal followed. On appeal, Ms. Yau avers:

> 1. Even if Decedent and Appellant were not lawfully married, were:
>
>> (a) Decedent's *inter vivos* conveyance of realty, (b) his testamentary bequests of land and cash, and (c) their joint bank accounts nevertheless effective and valid?

2. Did the trial court erroneously declare the marriage between Decedent and Appellant to be invalid: (a) because Appellant and the father of her children never celebrated a marriage in Hong Kong or elsewhere?

(b) because the lower court failed to balance various presumptions in the interests of justice?

(c) because the allegedly invalid marriage subsequently became valid when Appellant obtained a divorce from the father of her children?

3. Did the trial court err by permitting the hearing to proceed after the interpreter announced that she could not understand Appellant because they spoke different dialects?

Ms. Yau's brief at 5.

Before addressing the above claims, we must set forth the applicable standard of review herein.

Our standard of review of an orphans' court's decision is deferential. *In re Estate of Strahsmeier*, 54 A.3d 359, 362 (Pa.Super. 2012). When reviewing an orphans' court decree, this Court must determine whether the record is free from legal error and whether the orphans' court's findings are supported by the record. *Id*. at 362–363. Because the orphans' court sits as the finder of fact, it determines the credibility of the witnesses and, on review, this Court will not reverse its credibility determinations absent an abuse of discretion. *Id*. at 363. However, this Court is not bound to give the same deference to the orphans' court conclusions of law. *Id*. Where the rules of law on which the orphans' court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree. *Id*. Moreover, we point out that an abuse of discretion is not merely an error of judgment. However, if in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be manifestly unreasonable or the

- 15 -

product of partiality, prejudice, bias, or ill will, discretion has been abused. *Id.*

*In re Estate of Zeevering*, 78 A.3d 1106, 1108 (Pa.Super. 2013).

We first address Ms. Yau's final allegation, which is that the "lower court erroneously permitted the hearing to proceed after the interpreter announced that she could not understand Appellant because they spoke different dialects." Appellant's brief at 42. We examine this position initially since, if meritorious, it would require a remand for another hearing.

The record belies Ms. Yau's representation that the interpreter and Ms. Yau spoke different dialects. After the qualifications of the interpreter were outlined, the proceedings began. At no point did Ms. Yau protest to the orphans' court that she could not understand the interpreter. Conversely, the interpreter never said that he did not understand Ms. Yau's dialect of Chinese.

When Ms. Yau, who was *pro se* at the hearing, began her cross-examination, problems arose because Ms. Yau was not conducting proper impeachment. Instead, she would call a witness a liar, argue with the witness, or start to testify as to her version of events. The court continued to interrupt Ms. Yau and instruct her that she had to ask questions and that she would have an opportunity to present her testimony later in the proceeding. These interruptions became admonishments since Ms. Yau continued to engage in prohibited argument and accusations. At one point,

Ms. Yau, without explaining this astonishing assertion, told the orphans' court that she was not able to ask questions, even though she appeared to be quite adept at being argumentative. The translator, during the exchanges between Ms. Yau and the orphans' court, had difficulty keeping up with the conversation, not understanding Ms. Yau's dialect. He thus asked Ms. Yau to speak more slowly on a couple of occasions and was able to translate once she did so. *Id*. at 135, 137.

It is not until Ms. Yau's daughter, Nga Ting Chan, began to testify that the interpreter stated, "She is speaking in another language[.] I don't understand the dialect in Chinese." *Id*. at 118. This statement related solely to Nga Ting Chan. At that point, Ms. Yau translated her daughter's testimony into English. *Id*. at 119-126.

In addition, Charles testified that Ms. Yau had a firm grasp of the English language and had taken English lessons. This testimony was reinforced by the orphans' court's observations. Orphans' Court Opinion, 5/22/14, at (unnumbered page) 6 ("I observed [Ms. Yau] speaking English just fine without an interpreter. Ms. [Yau's] difficulties with the language seemed to come and go as she needed them."). Ms. Yau earned her living by managing her rental properties, and thus, she had the ability to engage in financial dealings here in the United States. Given those facts and Ms. Yau's translation of her daughter's testimony, we concur with the orphans' court assessment that Ms. Yau did not need an interpreter in the first

instance.  We therefore conclude that Ms. Yau is not entitled to a new hearing due to the interpreter's purported inability to speak her dialect of Chinese.

We next address Ms. Yau's position that she was legally married to Mario.  We do so since, if Ms. Yau and Mario's marriage was valid for any reason, we need not address whether the orphans' court properly revoked the gifts and bequests that Mario made to Ms. Yau.[5]  In this respect, Ms. Yau first claims that she was never married in Hong Kong to Chan Cheung Kai.

We conclude that the orphans' court finding that Ms. Yau was married to Chan Cheung Kai was amply supported by the record and, thus, we cannot reverse that determination.  On December 17, 2010, Kai Mui Yau filed a complaint in divorce against Chan Cheung Kai, who was then residing in Hong Kong.  Petition of the Executor of the Estate of Mario Sacchetti for a Decree Declaring the Purported Marriage of Decedent and Linda Sacchetti aka Kai Mui Yau Null and Void and that the specific Bequests to Linda Sacchetti be Determined Null and Void, 11/14/11, at Exhibit C ¶¶ 1, 2; Trial Exhibit 4.  The divorce complaint stated that Ms. Yau and Mr. Kai were

---

[5] We note that this appeal pertains solely to the joint account created by Mario in his and Ms. Yau's joint names and the transfer of 2827 Bittern Avenue into the joint names of Mario and Ms. Yau.  Ms. Yau levels no challenge to the court's finding that she must return the coin collection and the money that she stole from the joint account that was owned by Mario and Charles.

"married on June 15, 1971 in Hong Kong." *Id*. Ms. Yau personally verified that the contents of the complaint were true and correct and that the statements were made subject to penalties of 18 Pa.C.S. § 4904, which pertains to unsworn falsification to authorities.

We observe that factual statements by a "party in pleadings . . . made for that party's benefit, are termed judicial admissions and are binding on the party." *Cogley v. Duncan*, 32 A.3d 1288, 1292 (Pa.Super. 2011). Judicial admissions are automatically considered "true and cannot be contradicted by the admitting party." *Id*. Judicial admissions are "conclusive in the cause of action in which they are made—and any appeals thereof—and the opposing party need not offer further evidence to prove the fact admitted." *Id*. In the present case, the facts set forth in the divorce complaint may not be considered as binding, since this action is different from the divorce lawsuit. Nevertheless, Ms. Yau swore to the veracity of the averments in the divorce proceedings upon penalty of criminal sanctions. She gave a precise date for her marriage to Mr. Kai. The orphans' court thus was entitled to give great weight to the representations that Ms. Yau made in the divorce case.

Additionally, Ms. Yau's verified factual assertions in her divorce complaint filed against Mr. Kai were confirmed by other proof. For example, Ms. Yau called Mr. Kai her husband at the evidentiary hearing and admitted that, after she and Mario were refused a marriage license in 2007, she

attempted to obtain copies of her marriage license and divorce certificate with respect to Mr. Kai. In addition, Ms. Yau applied for a visa in 2002 and stated in that application that she was married. A deed and mortgage documents prepared prior to 2008 reported that Ms. Yau was a married woman. Finally, Ms. Yau admitted that the agreement of sale of one of her apartments in Hong Kong listed as buyers Chan Cheung Kai and Kai Mui Yau and that she was characterized therein as a married woman. The orphans' court was not required to accept Ms. Yau's testimony to the contrary.

On appeal, Ms. Yau relies upon a document that she attached to her answers to Charles' various petitions. It was a copy, not an original, of a document purporting to be from the Deputy Registrar of Marriages for Hong Kong. It indicated that there was no record of a marriage for Ms. Yau from 1945 to 2010 in Hong Kong. Contrary to Ms. Yau's position in her brief, this document was never introduced into evidence at the evidentiary hearing. Appellant's brief at 30 n. 9 (citing N.T.Hearing, 11/26/12, at 139-40).

Instead, the record establishes that, at pages 139-40 of the transcript, Ms. Yau proffered a document containing three pages. The first page was a copy of the marriage ordinance enacted in Hong Kong, and the "next two pages are two pages from a larger document that was marked as an exhibit but the exhibit sticker has been pulled off and it purports to be a legal analysis of whether [Ms. Yau] entered a common law marriage when she cohabitated with her then boyfriend from 1975 to 1990 in Hong Kong." N.T.

Hearing, 11/26/12, at 139. However, the document from the Deputy Registrar of Marriages of Hong Kong was never introduced into evidence. The document contained in the record and attached to Ms. Yau's answers is a black and white copy. We decline to give any weight to the unauthenticated document that was never admitted at the evidentiary hearing herein.

Ms. Yau's second position about the validity of her marriage is that, "Even if Ms. Yau and Chan were legally married, the lower court was required to balance various presumptions in the interests of justice." Appellant's brief at 32. This position was never raised before the orphans' court and was not addressed by it. In responses to Charles' petitions, during the orphans' court hearing and in her exceptions, Ms. Yau's position was two-fold: 1) she never was married to Chan Cheung Kai; and 2) if she was married to Chan Cheung Kai, her marriage to Mario became valid after she divorced Chan Cheung Kai. Hence, this contention is waived. Pa.R.A.P. 302(a).

Ms. Yau's third attempt to validate her marriage to Mario is premised on the following argument. Even if she had been legally married to Chan Cheung Kai when she married Mario, her marriage to Mario became valid as of February 16, 2011, the date she obtained a divorce from Chan Cheung Kai. In this connection, Ms. Yau relies upon this statute:

> **(a)   General rule.--**If a married person, during the lifetime of the other person with whom the marriage is in force, enters into a subsequent marriage pursuant to the requirements of this part and the parties to the marriage live together thereafter as husband and wife, and the subsequent marriage was entered into by one or both of the parties in good faith in the full belief that the former spouse was dead or that the former marriage has been annulled or terminated by a divorce, or without knowledge of the former marriage, they shall, after the impediment to their marriage has been removed by the death of the other party to the former marriage or by annulment or divorce, if they continue to live together as husband and wife in good faith on the part of one of them, be held to have been legally married from and immediately after the date of death or the date of the decree of annulment or divorce.

23 Pa.C.S. § 1702(a).

This provision was interpreted in ***Covington v. Covington***, 617 A.2d 1318 (Pa.Super. 1992), where the parties married based upon the belief that they were both legally divorced from their prior spouses.  Husband's divorce decree from his first wife, however, was not actually entered until thirteen days after the Covingtons' May 29, 1971 marriage ceremony.  Except for a brief separation in 1978, "the parties lived together as husband and wife" from May 29, 1971, until September 15, 1989, when Mrs. Covington filed a divorce action against Mr. Covington.  ***Id***. at 1319.

Mr. Covington requested and was awarded alimony *pendente lite*, which Mrs. Covington refused to pay.  She maintained that their marriage was void since it was entered before Mr. Covington was actually divorced. He invoked 23 Pa.C.S. § 1702(a), and we affirmed the trial court's

application of that section. We noted that Ms. Covington acknowledged that she had lived with Mr. Covington as husband and wife for years after he obtained the divorce decree from his previous wife. We rejected Ms. Covington's assertion that she had to know about the impediment to her marriage and assent to the continued validity of the marriage once the impediment was removed. Thus, the fact that the Covingtons continued to live together as husband and wife after his divorce was granted was sufficient to satisfy § 1702(a).

In order to properly fall within the express statutory language of § 1702(a), Ms. Yau had to prove that she "lived together as husband and wife" with Mario after she obtained her divorce from Mr. Kai on February 16, 2011. The orphans' court rejected the application of § 1702(a), concluding that Ms. Yau did not live together with Mario as husband and wife after Ms. Yau's divorce. It premised this ruling first on the fact that Mario filed annulment papers within two months of the divorce decree. The orphans' court viewed this fact as compelling evidence that Mario did not live together with Ms. Yau as husband and wife. Alternatively, the orphans' court refused to view the arrangement at issue herein as one that could be considered as "living together as husband and wife" within the meaning of the statute.

We hold that the orphans' court's finding that the statute was not satisfied herein is amply supported by the record. We first observe that the orphans' court specifically credited Charles' testimony in total and rejected

as utterly incredible everything that Ms. Yau said at the hearing. We must accept this credibility determination unless it constituted an abuse of discretion. Ms. Yau forged three checks. In the face of her own admissions in a lawsuit and visa application as well as numerous legal documents proving the contrary, Ms. Yau, under oath at the evidentiary hearing, denied that she was married to Mr. Kai in Hong Kong. Thus, the orphans' court did not abuse its discretion in rejecting Ms. Yau's assertions that she moved into Bittern Avenue after the marriage and that she and Mario had a full conjugal relationship.

The court, instead, found that Charles' testimony was an accurate description of the events that occurred after February 16, 2011. In light of that testimony, we cannot overturn the orphans' court's finding that Ms. Yau and Mario did not "live together as husband and wife" at all. Charles testified unequivocally that Ms. Yau never moved to 2827 Bittern Avenue at any point and instead continued to live at her own property. Charles was asked, "At any time did you see [Ms. Yau] move into Bittern Place with a moving truck and all her personal possessions?" N.T. Hearing, 11/26/12, at 20. Charles responded, "No." *Id*.

The language of the statute is clear and unequivocal. It provides that, in order for a marriage that is invalid due to the existence of a prior marriage by one party to become valid after the impediment is removed, the parties must continue to "live together as husband and wife." Simply put,

Mario and Ms. Yau never lived together at all. We are aware that marital relationships between people can have various iterations. Spouses can live separately for years but remain married legally, and sex may or may not be a component of a marital relationship. However, we cannot ignore the statutory language involved herein. At the very least, Mario and Ms. Yau were required to live together to satisfy § 1702(a)'s terms.

In addition, even if we viewed the statute as permitting a marriage to arise based upon how the parties envisioned their marriage would operate, the evidence herein clearly established that this result did not occur in the present case. Charles' testimony proved the following. The marriage was to be a business arrangement. Mario would obtain legal status for Ms. Yau in the United States and would give Ms. Yau $25,000 and the 2827 Bittern Avenue house after his death. In return, Mario "expected to have someone **as a companion**. He had been very lonely for many years. So he was looking for **a companion** and he also expected her to take care of him, watch out for him, clean and cook." N.T. Hearing, 11/26/12, at 14-15 (emphases added).

The evidence conclusively established that Mario fulfilled his end of the bargain by transferring the home on Bittern Avenue into Ms. Yau's name and by giving her $25,000 in his will. Mario also attempted to obtain a green card for Ms. Yau but was prevented from obtaining one due to Ms. Yau's prior marriage. On the other hand, Ms. Yau failed to perform any of the

obligations imposed upon her under the terms of the agreed-upon marriage arrangement. Charles testified that, after the marriage ceremony on December 6, 2008, Ms. Yau performed housekeeping briefly and quickly ceased that acitivity. *Id*. at 20-21. Shortly after the marriage ceremony, Ms. Yau was rarely present when Charles visited, and she thus did not provide Mario companionship or care. *Id*. at 24. Charles continued to take Mario to his doctor appointments.

Toward the end of 2010, Mario's cardiologist told Charles not to leave Mario alone. Charles conveyed this warning to Ms. Yau, who ignored the request to stay with Mario. On February 16, 2011, the Court of Common Pleas of Cameron County issued the divorce decree declaring that Ms. Yau and Mr. Kai were divorced. After that date, Ms. Yau did not perform any housework and rarely visited. Charles reported that, occasionally, Ms. Yau would make meals for Mario, but the majority of the time, Charles and his family ensured that Mario had food.

Mario fulfilled his portion of the marital arrangement, but Ms. Yau utterly failed in her responsibility to provide care and companionship for him. Thus, the parties did not even live together as husband and wife in accordance with the agreement reached between them as to how the marriage was to operate. For all of the foregoing reasons, we affirm the orphans' court's refusal to apply § 1702(a).

We now address Ms. Yau's position that, even in the absence of a valid marriage between her and Mario, the gifts of realty and the Prudential Savings Bank account as well as the testamentary bequests were valid. She first avers that the gift of 2827 Bittern Avenue to her should not be overturned since the ownership of the real estate should be considered a joint tenancy with right of survivorship. Ms. Yau maintains that, even if the marriage was void, the conveyance of real estate to Mario and Ms. Yau as tenants by the entireties operated to convey a joint estate with right of survivorship. Ms. Yau relies upon case authority involving a transfer of real estate to two unmarried people as joint tenants by the entireties. Since an entireties estate cannot be held by unmarried persons, the law provides that the appropriate form of tenancy in such circumstances is to be determined by the intention of the parties, "the ultimate guide by which all deeds must be interpreted." *Riccelli v. Forcinito*, 595 A.2d 1322, 1325 (Pa.Super. 1991)

The first flaw with Ms. Yau's attempt to invoke this principle is that she presented no proof that Mario would have bestowed on her survivorship rights to his property if he had known that she fraudulently induced him to marry her and would not perform her marital obligations. The evidence clearly established that Mario did not know that Ms. Yau was married to Mr. Kai when he married her. In addition, Ms. Yau fraudulently induced Mario into believing that, in return for Bittern Avenue and $25,000, she would

provide companionship and cook and clean for him during what was intended to be a marriage of short duration, given Mario's advanced age, heart problems, and diabetes. As outlined above, Ms. Yau failed to perform those functions for Mario. Hence, Ms. Yau's reliance upon this law is misguided.

The authority cited by Ms. Yau is inapposite for an additional reason. The orphans' court invalidated the entire transfer of 2827 Bittern Avenue to Mario and Ms. Yau based upon application of a different principle. In concluding that the gift of Bittern Avenue was void, the orphans' court relied upon Restatement (First) of Restitution § 58 (Gifts Made in Reliance on a Relation), which we applied in **Lindh v. Surman**, 702 A.2d 560 (Pa. Super. 1997), *aff'd*, 742 A.2d 643 (Pa. 1999). Therein, we discussed case law regarding conditional gifts as outlined in § 58, which provides,

> A person who has conferred a benefit upon another, manifesting that he does not expect compensation therefor, is not entitled to restitution merely because his expectation that an existing relation will continue or that a future relation will come into existence is not realized, **unless the conferring of the benefit is conditioned thereon**.

Restatement of Restitution, § 58 (emphasis added).

The comments to that provision extrapolate:

> *(b) Conditional gifts.* The gift may be conditional upon the continuance or creation of a relation, and if conditional the donor is entitled to its return if the relation terminates or is not entered into. The condition may be stated in specific words or it may be inferred from the circumstances. Likewise, as in the case of

- 28 -

engagement and wedding gifts, justice may require the creation of a condition although the donor had no such condition in mind.

Restatement of Restitution, § 58 comment b.

The orphans' court found, and the evidence supports, that Mario transferred Bittern Avenue to Ms. Yau based upon his belief that they were actually married and that she would care, cook, clean, and provide companionship for him. It observed, "These gifts [of Bittern Avenue and the joint bank account at Prudential Savings Bank] were conditional because they were conditioned on Decedent's belief that he would be married to [Ms. Yau] and she would then take care of him. Neither of these conditions were satisfied." Trial Court Opinion, 5/22/14, at (unnumbered page) 10.

The evidence revealed that the Bittern Avenue house would be transferred to Ms. Yau after they married and that the gift was in reliance upon an arrangement whereby the parties were married and Ms. Yau cared and provided companionship for Mario. The marriage was invalid, and Ms. Yau did not take care of or provide companionship to Mario. Since the gift was made in reliance upon conditions that decidedly did not occur, the orphans' court properly applied the law of conditional gifts and voided the transfer of 2827 Bittern Avenue to Ms. Yau.

The orphans' court decision is supported by the reasoning in **Semenza v. Alfano**, 279 A.2d 29 (Pa. 1971), where Semenza bought property and placed it in his and Alfano's name because Alfano promised to marry him if

he bought her a home. After Alfano refused to marry Semenza, he successfully voided the transfer of the real estate based upon application of the law governing conditional gifts. Therein, our High Court noted, "A gift to a person to whom the donor is engaged to be married, made in contemplation of marriage, although absolute in form, is conditional; and upon breach of the marriage engagement by the donor the property may be recovered by the donor." *Id*. at 31; *see also Pavlicic v. Vogtsberger,* 136 A.2d 127, 128-32 (Pa. 1957) (gifts were voided under law of conditional gifts since gifts were made based upon misrepresentations of recipient that she intended to marry donor); *Nicholson v. Johnston*, 855 A.2d 97 (Pa.Super. 2004) (affirming that money for down payment and closing costs for purchase of real estate made by payor constituted a conditional gift contingent upon a marriage occurring so that those monies were returned to payor in partition action even though real estate was placed in joint names of payor and his then fiancée).

The gifts of the house and bank account, conditioned on events that did not occur, are void under the applicable law. We find irrelevant that Mario did not undertake to undo the gifts during his lifetime. None of the legal principles applied in this area of the law requires that the person take an affirmative action while alive before a gift will be considered conditional. Additionally, we cannot make any inference from the evidence presented herein that Mario's failure to seek, through litigation, to reverse the gifts

- 30 -

renders them valid. Charles reported that, when Mario discovered that his marriage was invalid, Mario's health began to decline steeply. In addition, two months before he died, Mario did file an annulment action, seeking to set aside the fraudulent marriage upon which the gifts were conditioned.

Ms. Yau next asserts that the testamentary gifts of the home on Bittern Avenue and $25,000 nevertheless were valid despite the fact that she and Mario were not lawfully married. She relies upon the general rule is that "a disposition in a will, even though made by reason of a mistake of fact, remains valid." Appellant's brief at 18. *See In re Estate of Angier*, 552 A.2d 1121 (Pa.Super. 1989) (the fact that testator may have mistakenly believed that will contestant was not his biological daughter did not invalidate will wherein testator left his estate to a friend who cared for him for years).

However, a mere mistake of fact is distinct from actual fraud. Standard Pennsylvania Practice provides an apt summary of the applicable law:

> Generally speaking, fraud with respect to a will consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture, by which a person is deceived to his or her disadvantage. However, to invalidate a will, the fraudulent act must have the effect of misleading the testator, which can occur only if the testator relies on it. Thus, if the testator to whom a misrepresentation was made knew the truth at the time he or she executed the will, it cannot be said that the testator relied on such representation, and fraud is not

established. In order to establish that a will was fraudulently induced, it must also be shown that: (1) the testator had no knowledge of the concealed or misstated fact; and (2) the testator would not have made the same bequest had he or she known the truth.

**Illustration:**

Where a testatrix bequeathed a large sum to a trust company believing that such bequest was a legal means of providing for the distribution of the funds to specified charities, the scrivener, a trust officer who failed to warn the testatrix that the bequest was absolute, engaged in constructive fraud which served to invalidate the bequest.

31 Standard Pennsylvania Practice 2d § 148:76 (footnotes omitted).

Thus, fraud can invalidate both an entire will and a specific bequest. As our Supreme Court observed in *In re Alexander's Estate*, 55 A. 797 (Pa. 1903), a bequest in a will can be voided where the testator was misled and was clearly mistaken in connection with the disposition made in a will. Our High Court followed this precept in *In re Stirk's Estate*, 81 A. 187 (Pa. 1911), when it invalidated a specific bequest procured by misrepresentation. Therein, the testatrix was led to believe by an agent of a trust company that a bequest made to a trust company in her will would inure to the benefit of certain charities, which were unquestionably the intended recipients of the testatrix's money. However, the language of the will left the property absolutely to the trust company.

The *Stirk's* Court refused to enforce the bequest to the trust company, finding that the terms of the will "produced a testamentary act the

legal effect of which was wholly misapprehended by the testatrix." *Id*. at 191. Therein, there was no doubt that the testratix believed that the trust company would be "a medium through which the charities she had indicated would receive her bounty," but that the language of the will did not effectuate that intent. *Id*. Based upon the fact that the scrivener of the will misled the testatrix into believing that the language of the will was in accord with what she wanted, the court concluded that the bequest was procured by constructive fraud and therefore unenforceable. *Id*.

More recently, in *In re Estate of Glover*, 669 A.2d 1011 (Pa.Super. 1996), this Court struck down a specific bequest of money to a person who stole money from the decedent. Therein, the testatrix was survived by her husband, a brother, her brother's children, and her husband's and nieces and nephews. Her husband had executed an antenuptial agreement and received two million dollars of decedent's eight million dollar estate. Decedent's brother and his children (the "Glovers") were the decedent's intestate heirs and residuary beneficiaries under a will that made various specific bequests of substantial sums.

One of decedent's friends, Lynn Hurley, was given a specific bequest of $50,000 in the will. After Ms. Glover and Hurley became friends, Hurley became signatory on some of Ms. Glover's bank accounts and began to write checks on the accounts without the approval of Ms. Glover. While this Court

refused to invalidate the entire will based upon undue influence or fraud, we did conclude that the bequest to Hurley was invalid due to Hurley's fraud.

In *Glover*, we noted that, in order to strike a bequest, the contestant must establish two elements: "(1) the testatrix had no knowledge of the concealed or misstated fact, and (2) the testatrix would not have made the same bequest had she known the truth." *Id*. at 1016. We concluded that there was no question that Ms. Glover was not aware that Hurley was taking money from her. We also held that "it would be 'absurd' to suggest that, had [Ms. Glover] been aware of Hurley's massive misappropriation of funds, this gift would have stood." *Id*. We thus ruled that the $50,000 bequest to Hurley was invalid.

The *Glover* decision applies herein. To avoid this case authority, Ms. Yau claims that the orphans' court never found that she committed fraud. She is mistaken. Trial Court Opinion, 5/22/14, at (unnumbered page) 10 (gifts of house and bank account should be void due to Ms. Yau's "fraudulent representation that she was legally able to be married to Decedent"). Likewise, the evidence provided by Charles, and credited by the orphans' court, was that Ms. Yau committed fraudulent acts that voided the specific bequests. She falsely led Mario to believe that she was free to marry him and would be a companion and care for him. Further, she stole nearly $27,000 from an account that Mario owned with Charles as well as his coin collection and car, which was recovered by Charles in front of her home.

- 34 -

Thus, the record fully supports the orphans' court finding that Ms. Yau committed fraud upon Mario and that Mario, had he known about the fraud when he executed the will, would not have left Ms. Yau either the home on Bittern Avenue or $25,000. The specific bequests to Ms. Yau in Mario's will were properly struck down under the noted authority.

Appellant next avers that she owns the assets in the Prudential Savings Bank account that Mario transferred from his name into his and her names due to the operation of 20 Pa.C.S. § 6304(a), which states:

> **(a) Joint account.**--Any sum remaining on deposit at the death of a party to a joint account belongs to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intent at the time the account is created. If there are two or more surviving parties, their respective ownerships during lifetime shall be in proportion to their previous ownership interests under section 6303 (relating to ownership during lifetime) augmented by an equal per capita share for each survivor of any interest the decedent may have owned in the account immediately before his death; and the right of survivorship continues between the surviving parties..

Ms. Yau's position in this respect suffers from the same problems as that involving the deed. The orphans' court, applying the law of conditional gifts, invalidated the transfer of the Prudential Savings Bank account assets from Mario's name into the joint names of Ms. Yau and Mario in the first instance. Since the transfer was void, the statutory presumption outlined in the Act was not operative in the first instance.

Additionally, we conclude that § 6304(a) was inapplicable for a different reason. This provision of the Multiple Party Account Act (the "Act")

at 20 Pa.C.S. §§ 6301–6306 outlines a statutory presumption, which can be rebutted by clear and convincing evidence. **See In re Estate of Cella**, 12 A.3d 374 (Pa.Super. 2010). "The purpose of the presumption is to provide financial institutions with 'the certainty and regularity required for the general course of human commerce' and to avoid 'the protracted resolution of family disputes[.]'" **Id**. at 380 (partially quoting **In re Novosielski,** 992 A.2d 89, 106-07 (Pa. 2010)). Thus, the statutory presumption can be overcome. Indeed, in **In re Estate of Strahsmeier**, 54 A.3d 359 (Pa.Super. 2012), we concluded that another statutory presumption in the Act, which involved the ownership of "in trust for" accounts following a person's death, was overcome by the evidence presented and that the person who should have received the account following the death of the account's owner was not entitled to the account assets. The clear and convincing evidence of Ms. Yau's fraud and the theft of Mario's money was sufficient to overcome any presumption that he intended her to receive the assets in the joint account.

Finally, Ms. Yau avers that the court erred in applying the law of conditional gifts because the gifts occurred after the marriage ceremony between her and Mario. She overlooks the fact that she and Mario executed a prenuptial agreement. The gifts were made in fulfillment of that agreement, which was executed prior to the marriage ceremony. The gifts also were made while Mario was unaware that his marriage to Ms. Yau was

invalid and that she would neglect him. We thus reject this challenge to the orphans' court's application of the law of conditional gifts.

As the orphans' court correctly applied the law, we have no basis upon which to reverse its rulings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/20/2015